No. 2645.

GREEN LYNCH *v.* THE STATE.

1. MURDER—EVIDENCE.—DECLARATIONS or acts of a defendant in his own favor, unless part of the *res gestæ* or of a confession offered by the prosecution, are not admissible for the defense. Under this well established rule the trial court did not err, in this case, in refusing to permit the defendant to prove his statements and declarations made fifteen or twenty minutes after the homicide, and after he had gone twelve hundred yards from the place of the killing.

2. SAME—CHARGE OF THE COURT.—The evidence in this case disclosed that, at the time of the homicide, the defendant was on his way to the post office in the town of E. As tending to show that his meeting with the deceased was unpremeditated and accidental, the defendant proposed to prove by a witness that, on the Saturday before the Monday on which the homicide occurred, he told the witness that he would meet him at the post office in E. on the said Monday. The trial court excluded the proposed testimony, and charged the jury as follows: "The defendant had the right to go to the post office or any other place he desired to go for a lawful purpose; but if he started to go to or by the house of the deceased merely to get an excuse to kill him, or with the intention of seeking or getting into a fatal rencontre with the deceased, and thus got into the difficulty, then the defendant can not justify the homicide, even though his life was put in peril." *Held,* that waiving the question of the correctness of the ruling of the court in excluding the proposed evidence, the charge of the court was radical error, because it was predicated upon no evidence whatever showing a hostile intention of the defendant in going to or by the house of the deceased. The rule is that, "however correct a principle of law may be in the abstract, it is error to give it in charge if there is a total want of evidence to support the phase of case to which it is applied."

3. SAME—THREATS—STATUTE CONSTRUED.—Article 608 of the Penal Code provides that threats afford no justification for homicide, "unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made." *Held,* that under a proper construction of this statute, the act done

must manifest the *immediate* intention to execute the threat so made. It was not error, therefore, that, in his charge upon this subject, the trial judge interpolated the word "immediate" to qualify "intention." See the opinion in extenso on the question.

APPEAL from the District Court of Fannin. Tried below before the Hon. D. H. Scott.

This conviction was in the second degree for the murder of A. J. Guess, in Fannin County, on the twenty-fifth day of April, 1887. A term of seven years in the penitentiary was the penalty assessed against the appellant.

Mrs. S. J. Guess was the first witness for the State. She testified that she was the widow of A. J. Guess, who died in Fannin county, Texas, on the evening of April 25, 1887, from the effects of a gunshot wound inflicted by the defendant. The shooting occurred at about six o'clock p. m. at a point about forty yards from the deceased's house, which was situated in Fannin county, about eighteen miles northeast of Bonham, and about two and a half miles south of Elwood. The witness and L. Crutchfield were the only persons present at the time of the shooting. The witness was in her house, but witnessed the tragedy through a large opening in the wall, used for a window. When witness first observed her husband, just before the shooting, he was just turning from the field gate, leading his mare with the plow harness still on. The gate was closed. Crutchfield was sitting in a wagon holding the reins. The wagon was standing still. Defendant was standing on the ground near the wagon. Deceased started to the gate, leading his mare, and walking slowly. He passed the wagon on the east side. Defendant went to the west side of the wagon, got his gun and walked to the head of the team, where he stood for a moment, holding the gun in a shooting attitude. Within the moment the deceased appeared at the front of the wagon, leading his mare, when the defendant fired both barrels of his shot gun, and deceased fell. Deceased was standing perfectly still, holding the reins of his mare and facing the defendant when the fatal shots were fired, but was making no demonstrations at defendant. As soon as he fell the witness ran to him and caught his head in her arms. He gasped once or twice, but expired without speaking. Witness turned to the defendant, who was still standing near with his gun in his hand, and said to him: "Oh! Uncle Green, what did you do this for?"

Defendant made no reply, but got into the wagon and drove back 'through the field, the way that he had come.

If anything was said by either of the parties at the time of the shooting, the witness did not hear it. Crutchfield did not interfere, or make any attempt to prevent the shooting, The deceased was totally unarmed at the time of the shooting, except that he had an old pocket knife which, after his death, was found in his pocket, closed. The shots took effect in the left breast, in the region of the heart, and made a wound about two inches in diameter. Deceased had been plowing in his field. The gate through which he came opened out of his field, and was his only means of getting out of the field to go to his house. It was about the usual time of quitting work and coming home. The road on which the defendant and Crutchfield were traveling led through the gate at which the killing occurred, across the field, and out at the south gate. When the shooting occurred, the wagon was about ten feet from the gate. The field in which the killing occurred belonged to the witness's father, A. R. McRae, who located the road across it, with the gates mentioned, for the convenience of his neighbors. The deceased had rented, and was working that part of the said field on which the killing occurred. Deceased and defendant had a difficulty about two years before the killing. That difficulty occurred in the Indian Nation. The cause of it was a business transaction entered into by witness during the absence, and without the knowledge or consent of the deceased. She bought a stove in the said Nation, and the defendant became her surety on the purchase. When her husband learned of the purchase he disapproved of it, because he was unable to pay for it. Shortly after this, deceased and witness started back to Texas, and defendant, who then as now, lived in the Nation, followed them, and made deceased pay for the stove. He also telegraphed to Fannin county, and had deceased arrested about a fifty dollar debt due him by deceased. These transactions gave rise to ill-feeling between deceased and defendant. Defendant lived in the Nation at the time of the killing. Deceased had lived in the Nation, but had resided in Fannin county for two years at the time of his death. The deceased's left hand, in which when he was shot he was holding his mare's bridle, was crippled and could not be straightened. His mare broke loose when the gun fired. Defendant said nothing after firing the fatal shot, but put his gun in the wagon and started to unhitch the team. Crutchfield told him that he could

take the wagon as easily as he could the mule team. Defendant then got into the wagon and drove off.

On or about the thirteenth day of April, about twelve days before the homicide, witness heard of the defendant's arrival at her father's house, and wrote him a note warning him not to come to deceased's house, as deceased was still angry with him, and had, on the day that witness wrote the note, taken his gun with him to the field, remarking that defendant might come to the field, and that, if he did, he, deceased, might hurt him. When defendant first came to the neighborhood, and to witness's father's house, deceased said that if he came on his place one of them would get hurt. For two days afterwards deceased took his gun with him to the field, but carried it no other days, and witness thought the crisis was passed. Witness never heard the deceased threaten to hurt the defendant except in the event the defendant should come on his place. When the killing occurred, the deceased's gun was in his house, hanging on the rack. There was a road around and outside of the field, which led to Elwood, but the road through the field was the nearest, and the one most generally traveled by neighbors going to Elwood. Witness did not know of her own knowledge that defendant had ill-feelings toward deceased when they met on the fatal evening, but she knew that deceased was still angry with defendant for the treatment he received at defendant's hands two years before.

W. F. Castlebury testified, for the State that the defendant came to A. R. McRae's house about a week before the homicide. On the Thursday before the fatal Monday, he, defendant, bought a double barreled shot gun from the witness. At the time of the purchase he said that he wanted the gun to hunt squirrels. He did not say a word about the deceased. There was a road to Elwood which ran outside and around the field in which the killing occurred, but the road through the field was the shorter, and was generally traveled by the neighbors.

A. R. McRae testified, for the State, that the deceased was his son-in-law, and the defendant his brother-in-law. The latter, who lived in the Indian Nation, came to the witness's house on the Tuesday or Wednesday before the fatal Monday. On the Thursday after he came he bought a double barreled shot gun. He sometimes carried the gun when he left witness's house, and sometimes he did not. The witness had been planting cotton, using Crabtree's planter, which he promised to send home on the fatal day. While Mr. Hardy was hitching the team to the

23

wagon to take the planter home, the defendant, armed with his gun, and L. Crutchfield came to the field from witness's house. Defendant and Crutchfield got into the wagon with the planter, and started over the field road towards the deceased's house. Defendant had a letter which he said he was going to mail. This was about five o'clock p. m. Some time after the wagon left, the witness heard two reports of a gun fired in rapid succession, and knew at once what had happened. Defendant got back to witness's house with the wagon, about dusk. The distance between the houses of the witness and the deceased was about twelve hundred yards. From the point in the field where defendant started with the wagon, to deceased's house, the distance was about nine hundred yards. Defendant reached witness's house about fifteen or twenty minutes after witness heard the reports of the gun, and immediately sent for officers, to whom he surrendered. The road through the field in which the killing occurred was left open by the witness for the convenience of his family and neighbors in going to Elwood, and no part of the said road was rented to the deceased. The road around the field was longer than the field road, and passed by the point in the field where the deceased was said to have been plowing just before the killing. Defendant lived in the Nation, but came to the neighborhood for medical treatment by Doctor Bates of Bonham. He went to Bonham to see Doctor Bates before the killing, but, finding Doctor Bates absent, he came back to the witness's house. After the killing the defendant received a postal card from Doctor Bates, stating when he would return to Bonham. At the time of the killing the defendant was expecting a letter from his wife, who was at his home in the Nation. The Red river was but two miles from the place of killing, the intervening country, with which the defendant was well acquainted, being heavily timbered. Defendant could easily have effected his escape into the Nation after the killing. Defendant was a feeble, sickly man, forty-five or fifty years old. Deceased was a strong man, in good health, thirty or thirty-five years old. The deceased's corn rows ran to the fence on the west side of witness's field, along which the outside road led to Elwood. Deceased was plowing his corn on the day of the killing. The plat here introduced in evidence was made by the the witness, and was correct. It is as follows:

Statement of the case.

2½ miles from Elwood to McRae's.
1200 yards from McRae's to Guess's house.
900 yards from * in field to Guess's house.

The State's evidence closing with the plat, the defendant introduced L. Crutchfield as his first witness. Mr. Crutchfield testified that he was present and witnessed the homicide. The witness was in a wagon taking home Mr. Crabtree's cotton planter, which Mr. McRae had borrowed. Defendant was in the wagon with him, on his way to the Elwood post-office. Elwood was on the road to Crabtree's. The road traveled by witness passed the house of the deceased at a point about forty yards from the gate that led out of the field. During the day the witness had been at work in the field south of the deceased's land, and started to Crabtree's from the place where he had been at work, which was about one-third of the distance from McRae's house to the deceased's house. While passing through the field, and when they reached a point about one hundred yards distant from the gate at deceased's house, the witness and the defendant saw the deceased plowing in his corn field. He was then coming over a hill. He came to the end of his row, turned and plowed about fifteen yards, when he stopped and hurriedly unhitched his plow mare, led the animal to a convenient stump, mounted her and ran her to the turn row leading to the road traveled by witness and defendant. He followed the wagon in a fast gallop. When the deceased mounted his mare from the stump, the witness remarked to defendant: "He is after you!" The defendant replied: "Drive up, and lets get out of the way." Witness whipped the mules into a fast trot, which he kept up until the gate was reached. Defendant got out of the wagon and opened the gate. Witness drove the wagon through and defendant closed the gate. At that instant the deceased galloped up, dismounted, opened the gate, and led his mare through. Defendant said to deceased: "Hello, Jack! What are you in such a hurry for?" Deceased replied: "If I get my gun, I will show you what I am in a hurry for." Defendant then came to the west side of the wagon and took his gun out. Deceased then started around the west side of the wagon, when defendant presented his gun, and said to him: "Sir! wilt; you have been following me, and have threatened and tried to kill me as often as I will allow you." Deceased then started back around the east side of the wagon, still leading his mare, and again said: "If I can get my gun I will kill you." Defendant then walked to the head of the team on the west side and stopped, and, when deceased got opposite to him on the east side of the wagon, defendant raised his gun and shouted "stop!"

Deceased replied: "Shoot, dogon you!" and defendant fired. Defendant's motion, raising the gun, frightened the mules attached to the wagon, and witness did not see either of the parties at the moment that the shots were fired. Up to that time witness had been watching deceased, and up to the moment that the mules became frightened, the deceased did not stop walking and leading his mare. Witness thought the deceased was walking, and not standing, when the fatal shots were fired. Witness was on the wagon on the side next to the defendant when the gun was fired. If two shots were fired, they were fired too near together for witness to distinguished them apart.

As soon as the gun was fired the deceased fell, and Mrs. Guess came running from the house to the prostrate form of her husband. She took his head in her lap and said to defendant: "Oh, Uncle Green, why did you do this?" Defendant made no reply, but put his gun in the wagon and began unhitching the mules. Witness told him that he could take the wagon back as easily as he could the mules, when he got into the wagon and drove back over the same road to McRae's house. Witness remained at the house of the deceased, and saw the deceased's rifle in the gun rack in the house. The deceased's ground was in the north part of McRae's field. Witness had been at work in the south part of McRae's field. The shortest route to Elwood from that point was over the road traveled by witness and defendant, and that road missed the defendant's corn field, in which he was plowing, about one hundred and fifty yards. The longer route, over the outside road and lane, would lead immediately by the west end of deceased's corn rows. On the next day after the defendant reached McRae's house, the witness saw the deceased and told him that defendant had arrived. Deceased, who was then in the field, replied that he knew it. Witness then said something about getting defendant, who was an expert plowman, to experiment with a certain plow. Deceased pointed to his gun standing against the fence, and said: "That is the plow he will plow with, the God d—d son of a bitch, if he comes in this field." In the same connection, deceased said that defendant had treated him very badly some time before that. On the Wednesday or Thursday before the fatal Monday the deceased came to the field where witness and Hardy were plowing, and said that he intended to kill defendant if he ever got in gun shot of him; that defendant treated him meanly in the Nation; that defendant induced his wife to buy a stove in the Nation when he was not able

to pay for it; that, when he went to leave the Nation, defendant
followed him with officers and made him pay for it. Witness,
in reply, told deceased that he had better be trying to make his
peace with his Maker than trying to kill his fellow man. At an-
other time, while defendant was in the field with witness's team,
deceased said that he had a mind to go and drive him out of the
field. At another time, deceased remarked that defendant would
come into that field and get hurt; and at another time he said
that "some of these days somebody will go hunting and come up
missing." Witness communicated deceased's various threats to
the defendant. He knew deceased to be a man likely to execute
a threat. Defendant had a letter with him at the time of the
killing, to be delivered at Elwood, and was then expecting a let-
ter from his wife.

On his cross examination the witness said that when he left
McRae's house to go to the field and take the planter home, the
defendant, taking his gun, went with him. When they got to
the field they found the boy Hardy hitching the mules to the
wagon in which the planter was to be hauled home. Deceased
could be seen plowing in his field from the point where witness
and defendant started with the wagon. Defendant had worked
a while that day in McRae's field. When the deceased passed
through the gate, just before the shooting, he did not go at once
around the east side of the wagon, but started around the west
side, on which side the defendant then was. The witness was
related to both the defendant and the deceased, but, not regard-
ing their quarrel as any business of his, he said nothing to either
of them at the time of the fatal meeting. Witness made no
effort to prevent the shooting, nor did he warn deceased when
defendant went to take his gun out of the wagon. When
witness last saw deceased before the shooting, which was an
instant before the shot or shots were fired, he was slowly pass-
ing the east side of the wagon, leading his mare. He had the
bridle reins in both hands behind him.

Will Hardy testified, for the defense, that he was in the field
with Crutchfield when Crutchfield told deceased that defendant
had come to McRae's, and that he was going to get the defend-
ant to try a certain plow. Deceased pointed to his gun, and said:
"That is the kind of plow he will plow with if he comes in this
field." In the same connection he threatened to kill defendant,
and said that somebody would "go hunting some time, and get
game;" and at the same time he related the stove transaction in

the Indian Nation as related by Crutchfield, and said further that, just after the stove transaction, defendant telegraphed a man named Bragg, and had Bragg and officers to collect fifty dollars from him, deceased, which he did not owe. He closed his outburst with the statement that defendant was "a d—d son of a bitch, and if he ever comes in this field, and I can look down a gun barrel, I will pull a trigger." On the Thursday before the fatal Monday, deceased came to the field. and told witness and Crutchfield that he would kill defendant if he ever got a chance, and that, if he ever got a "drive" at defendant, he would "get him" if he had to run him into McRae's house, and that he would kill defendant if he hung for it ten minutes later. Witness told defendant of all those threats, and heard Crutchfield tell him the same. On the day before the killing, the witness, on his way to singing, stopped at the deceased's house, and found the deceased alone. He remained there some time with him. During that time deceased said to witness: "Confidentially, between me, you and the gate post, if Lynch ever lays the gap down so I can save myself I will kill him; and if ever I come up with him it will be run, hang or fight." Witness did not report this last statement. Deceased had his gun in the field during two days after defendant came to McRae's. Witness was friendly to both defendant and deceased.·

Cross examined, the witness said that while he was hitching up his team to take the planter home, on the fatal evening, the defendant, armed with his gun, and Crutchfield came to the field, and defendant asked witness to let Crutchfield go with the planter, to which witness readily agreed. At that time deceased could be seen planting in his corn field, and he could have seen the parties at the planter. When, a short time later, witness heard the shots, he remarked: "Lynch and Guess have got into it at last."

W. H. Turner testified, for the defense, that, about two years before this trial, he sold a rifle to the deceased. Deceased at that time said that he wanted the gun to kill a man named Green Lynch, who was his wife's uncle, and who had recently treated him badly about a stove in the Nation.

Mrs. Mary McRae, the defendant's sister, testified, in his behalf, that defendant came to Texas from the Indian Nation just before the killing, to be treated by Doctor Bates, of Bonham. His health had been bad for two or three years, and witness wrote him to come to Texas for treatment. When defendant first

went to Bonham he was informed that Doctor Bates was absent. A few days before the killing he wrote to Bonham to ascertain whether the Doctor had yet got back. Four or five days after the killing a postal card addressed to "Green Lynch, Elwood, Fannin County, Texas," was received at Elwood. It read as follows: "Bonham, Texas, April 28, 1887. Dear Sir:—Yours of recent date received. My father, Dr. Bates, at present is at Aubry, Denton county, Texas, but will be at home next Monday, at one-thirty p. m. We would be glad to have you call. Yours, etc., Doctor E. M. Bates."

Five witnesses, including A. R. McRae, testified that they had known the defendant from twenty to thirty years, and that he had always borne a good reputation for peace and quietude, and as a law abiding, inoffensive citizen. A. R. McRae testified that deceased's reputation was just the reverse.

The defense closed.

Mrs. Guess testified, for the State, in rebuttal, that it was not true that after deceased passed through the gate he started around the west side of the wagon, towards defendant. He was walking along the east side, leading his mare, when he was shot.

One witness for the State testified that the "outside" road from McRae's to Elwood was a traveled road, and not more than two hundred or three hundred yards longer than the road through the field. Several witnesses testified that deceased's reputation for peace and quietude was good.

The excluded testimony referred to in the opinion and in the first head note was that the defendant, when he returned to McRae's immediately after the killing, told McRae that he, defendant, had shot Guess, and regretted that he had done so, but that he had to do so in order to prevent Guess from killing him, and that he did the shooting in self defense.

The motion for a new trial raised the questions discussed in the opinion.

*Lusk & Thurmond*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for murder of the second degree for the killing of one A. J. Guess, whose wife was a niece of this appellant.

There are several bills of exceptions as well as assignments of error presented in the record, which attack certain rulings of the trial court upon questions of evidence and certain portions of the charge given the jury, as also the refusal to give certain requested instructions asked for defendant. We propose to notice only such matters complained of as are considered of moment on this appeal.

I. Defendant complains that the court erred in refusing to permit him to prove his own statements and declarations with regard to the homicide, made within fifteen or twenty minutes after the killing, and after he had gone in a wagon some twelve hundred yards from the place of the killing. This identical question occurred in Stephens's case, 20 Texas Court of Appeals, 255, and it was there held that "declarations of a defendant concerning the crime charged against him, made ten or fifteen minutes after the commission of the same, and after he had gone a distance of four or five hundred yards from the place of the homicide, can not be treated as *res gestæ*, and are, therefore, not admissible in his behalf." "Declarations or acts of a defendant in his own favor, unless part of the *res gestæ* or of a confession offered by the prosecution, are not admissible for the defense." (Walker v. The State, 13 Texas Ct. App., 619.)

II. For the purpose of showing that the meeting with deceased was unpremeditated and accidental, defendant proposed to prove that, on the Saturday before the Monday when the killing occurred, he had told the proposed witness, Rogers, that he would be at the postoffice at Elwood on Monday evening to get his mail. This evidence was claimed to be admissible in connection with other evidence which he had introduced, showing that he was on his way to Elwood at the time the difficulty occurred, and tended also to establish that fact. Whatever may have been the theory of the State at the beginning of the trial with regard to this matter, we are of opinion that the evidence upon that point is positive and uncontradicted, to the effect that defendant had started to and was on his way to the Elwood post office, that he was going for his mail, that he was traveling the accustomed and most direct route; and there is no testimony that he had any purpose to seek and bring on a difficulty with deceased. True, he had a double barreled gun with him. But this he had a right to carry, and, if he was carrying it on account of the threats deceased had made against his life, this did not lessen but only emphasized the right. He did not go

out of his road or way to meet deceased. On the contrary, when he found that deceased had unhitched his horse from the plow and was rapidly following the wagon in which he was riding, he urges the driver to go faster "to get out of his way," and they do get to the gate, close it, and are outside the field when the deceased overtakes them.

Now, if under these circumstances it was still an open question as to whether he was going to the post office or not, then the excluded evidence was perhaps material and admissible as an additional fact going to prove it. If it was not an open or disputed question, the evidence was immaterial. In our opinion enough has been shown to establish its immateriality, and if this had been the view of the learned trial judge his ruling would have been correct. Such, however, does not appear to have been the case, because we find in the fifteenth paragraph of his charge, which is made a special ground for exception by the defendant, that the jury are instructed that "the defendant had the right to go to the post office, or any other place he desired to go for a lawful purpose, *but if* he started to or by the house of the deceased merely to get an excuse to kill him, or with the intention of seeking or getting into a fatal rencontre with the deceased, and thus got into the difficulty, then the defendant can not justify the homicide even though his life was put in peril."

With the testimony as disclosed in the record before us, there was no doubt as to his purpose and intention, or that it was a lawful one; he was, as all the witnesses who testify on that point say, going to the post office. If this be so, then this instruction, in so far as it questioned his intention and purpose, was not warranted by evidence, and was calculated to prejudice him with the jury by impressing them with the idea that, in the opinion of the court, there was serious doubt upon the subject. To our minds, one of two things must be apparent—either that the evidence excluded was material and should have been admitted if this instruction was warranted, or the instruction was itself unwarranted, because there was no disputable matter upon which to predicate it. In either aspect of the case the error is both important and serious. With the lights before us, we would say the ruling upon the evidence was correct, and the instruction erroneous. "However correct a principle of law may be in the abstract, it is error to give it in charge where there is a total want of evidence to support the phase of case to which it is ap-

plied." (Conn v. The State, 11 Texas Ct. App., 390.) "If the court assumes and charges on a theory not raised or indicated by the evidence, it is radical error and fatal to a conviction." (Ross v. The State, 10 Texas Ct. App., 455; Taylor v. ·The State, 13 Texas Ct. App., 184; Hardin v. The State, Id., 192; Stewart v. The State, 15 Texas Ct. App., 598.) A charge should be confined to the facts in evidence. (Boddy v. The State, 14 Texas Ct. App., 528; Mayfield v. The State, 23 Texas Ct. App., 645.)

III. A most vigorous attack is made, in the able brief of counsel for defendant, upon that portion of the charge of the court relative to threats made by deceased against defendant. It is insisted that whilst, in the twelfth paragraph, the court correctly announced the law as declared in article 608 of our Penal Code, that it was error in paragraphs thirteen and fourteen to interpolate the word "*immediate*," and thereby qualify the word *intention* as used in the statute. It is declared by the statute that threats afford no justification for homicide, "unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made." The jury were charged by the court that threats would afford no justification, unless the deceased "manifested an intention by some act done at the time showing an *immediate* intention to execute the threats."

Applied to the facts directly attendant upon the killing, it is contended that the use of the word "*immediate*" was not only unauthorized but deleterious in the extreme. Deceased was unarmed. He had dismounted to open the gate, had come through and was leading his horse, and defendant, who was still upon the ground, accosted him: "Hello, Jack; what are you in such a hurry for?" The reply was: "If I get my gun I will show you what I am in a hurry for." His gun was at his house, some forty or fifty yards distant. Defendant went to the west side of the wagon and took out his gun, and, as deceased started round the left side of the wagon, defendant presented his gun at him and said: "Sir, wilt! You have been following me, and threatened and tried to kill me as often as I will allow you to." Deceased turned and went round the east side of the wagon, still leading the horse, and said again: "If I get my gun I will kill you." Defendant walked to the head of the mules to the wagon, on the left side, and stopped, and when the deceased came opposite from the east side, defendant said: "Hold up," raised and presented his gun, and, as deceased said: "Shoot, dog on you," he fired

both barrels in quick succession, killing deceased instantly. Previous and deadly threats on the part of deceased were proven, and also the fact that he was a violent man and one likely to execute his threats.

It was the theory of the defense that deceased had seen defendant passing in the wagon, had followed him rapidly, and, when shot, was going to his house, some forty or fifty yards distant, to get his gun and with it execute his threats; and that defendant, in his legitimate right of self defense, had the right then and there to anticipate and shoot him. A special instruction requested for defendant, and which was refused by the court, embraced this theory, as follows, viz:

"If you believe from the evidence that, at the time of the killing, Guess was advancing towards defendant and toward's his (Guess's) house, with the avowed intention to get his gun and attack defendant, and take his life or do him some serious bodily injury, and if you further believe that the facts and circumstances in evidence were such as to create in the mind of defendant a reasonable belief and apprehension that such was the intention of Guess,  *  *  then defendant might act in advance and make the attack upon Guess. Nor was it necessary that there should in fact be real danger to defendant at the time of the killing, provided the facts and circumstances in evidence were such as to produce in the mind of defendant a reasonable fear or expectation of death or serious bodily injury."

As before stated, the language of our statute (Penal Code, art. 608) is that threats afford no justification "unless it be shown *that at the time* of the homicide the person killed, *by some act then done*, manifested an intention to execute the threat so made." In Penland's case (19 Texas Ct. App., 365) the doctrine of self defense enunciated by our Supreme Court in Lander v. The State, 12 Texas, 462, is quoted approvingly, as follows: "The belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or at least, is in apparent situation to do so, and thereby induces me reasonably to think that he intends to do it *immediately* (citing 4 Iredell, N. C., 409). No contingent necessity will avail." In Weaver's case (19 Texas Ct. App. 547), speaking of the doctrine of self defense, it is said that self defense "is a defensive, not an offensive, act," and that "to justify the destruction of human life, the danger must not be problematical and remote, but (apparently) evident and *immediate.*"

And, again: "The necessities of self defense are limited to the *immediate* resistance of (apparent) aggression, and the apprehension must have been excited by (acts evincing) an actual assault." "The danger to be averted must be apparently *immediate*, pressing, imminent and unavoidable." (See Hinton v. The State, 24 Texas, 454; Holt v. The State, 9 Texas Ct. App., 666.)

In Jones v. The State, 76 Alabama, 8, it is held that, to "establish the plea of self defense in a case of homicide, the defendant must have entertained at the time an honest belief in the existence of a present necessity on his part to kill in order to save his own life, or to prevent the infliction of grievous bodily harm, and the circumstances must have been such as to impress the mind of a reasonable man, under the same state of facts, with a belief of such imminent peril and urgent necessity."

In The People v. Westlake, 62 California, 303, the rule announced is that "past threats or conduct of the deceased, how violent soever, will not excuse a homicide without sufficient present demonstration to authorize the belief that the deadly purpose then exists, and the fear that it will then be executed." (See also Id., 204.) And in The People v. Tompkin, 62 California, 468, it is held that there must be such a demonstration of an immediate intention to execute the threat as to induce a reasonable belief that the party threatened will lose his life or suffer serious bodily injury unless he immediately defends himself against the attack of his adversary." In The State v. Horne, 9 Kansas, 119, it is said: "There must not only be reasonable ground to believe, but the purpose to execute the design must be accompanied by some attempt to execute it, or the person must at least be in an apparent situation to do so, and so induce a reasonable belief that he intends to do it immediately." (Same case, 1 Crim. Law Rep., Green, 718; see also The State v. Clifford, 5 Crim. Law Mag., 242.)

We are of opinion that a proper construction of the language of our statute (Penal Code, article 608) is that the act done by deceased manifesting his intention to execute his threats must be such an one as shows an *immediate* intention—"*at the time*"— "*then done*," and not an intention dependent upon some other contingency. Deceased's language showed that he had no such immediate intention, but he told defendant to wait until he got his gun, which was in his house, forty or fifty yards away. In the light of the authorities cited, and our view of the proper construction of the statute, we do not think the charge of the court

defective in the particular complained of; and, judged by the same rules of law, we think it must be apparent that the special requested instruction was not the law, and that, consequently, there was no error in refusing it.

Other questions presented on this appeal are of comparatively but little moment, and will not be discussed. Because the charge of the court in the fifteenth paragraph, as is previously shown, prejudicially instructed the jury as to a phase of the case unwarranted by the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*