(May 17, 1904.)

## STATE v. HARNESS.

### [76 Pac. 788.]

RAPE—STATEMENT OF COUNTY ATTORNEY TO JURY—ADMISSION OF EVIDENCE—FAILURE OF COURT TO INSTRUCT THE JURY AS TO PRESUMPTION OF INNOCENCE.

1. In the trial of criminal cases the county attorney should not be permitted to use language in his argument to the jury calculated to prejudice their minds against the defendant.

2. Statements made to another party by the person alleged to have been assaulted and raped, and not in the presence of the defendant, are not admissible, unless it be shown that it was so closely interwoven with the transaction that it becomes a part of the *res gestae.*

3. It is a statutory requirement that the court should instruct the jury in writing on all the material issues of the case, if the charge is a felony, but if he fails to do so, in order to predicate error, counsel must request the charge and have the court's refusal to give it, otherwise it is not error.

4. It is error to refuse to require the husband of the alleged injured party to testify whether he discovered marks or bruises on the person of the wife, when other witnesses had testified to certain marks and bruises.

5. Where one is convicted of the crime of rape and sentenced to a term of fourteen years' imprisonment, and the case is reversed on questions of law and sent back for a new trial, this court will not examine the evidence to ascertain whether the sentence is excessive.

(Syllabus by the court.)

APPEAL from District Court of Nez Perce County. Honorable Edgar C. Steele, Judge.

Defendant was tried and convicted of the crime of rape. From the judgment and order overruling his motion for a new trial he appeals. Judgment reversed.

The facts are stated in the opinion.

George W. Tannahill, for Appellant.

It was competent for the defendant to cross-examine the witness as to her antecedents, character and past conduct, and thus impair her credibility. This line of inquiry became important, because of the contention that the prosecution was prompted by the malice of this witness resulting from a failure to extort money, and more, the circumstances surrounding this case seem to justify a full cross-examination as to her past conduct and character. (*State v. Pefferle,* 36 Kan. 90, 12 Pac. 406; *State v. Probasco,* 46 Kan. 310, 26 Pac. 749; *State v. Wells,* 54 Kan. 151, 37 Pac. 1005; *State v. Park,* 57 Kan. 431, 46 Pac. 713; *State v. Greenburg,* 54 Kan. 161, 53 Pac. 61; *Brandon v. People,* 42 N. Y. 265; *People v. Casey,* 72 N. Y. 393; *Turner v. Territory,* 11 Okla. 660, 69 Pac. 804; *State v. Webb,* 6 Idaho, 428, 55 Pac. 892; *State v. Broadbent,* 27 Mont. 342, 71 Pac. 1; *State v. Abbott,* 65 Kan. 139, 69 Pac. 160; *State v. Collins et al.,* 33 Kan. 77, 5 Pac. 368; Horrigan and Thompson on Self-defense, p. 468; *Stewart v. Kindel,* 15 Colo. 539, 25 Pac. 990; *Blenkiron v. State,* 4 Neb. 11, 58 N. W. 587; *State v. Krum,* 32 Kan. 372, 4 Pac. 621.) The court erred in permitting the county attorney to make the fol-

lowing statement after the defendant had made his objection and exception: "I repeat it, gentlemen of the jury, any man is justified in taking the law in his own hands under such circumstances." (*State v. Irwin*, 9 Idaho, 35, 71 Pac. 608, 60 L. R. A. 716; *People v. Derbert*, 138 Cal. 467, 71 Pac. 564; *People v. Mitchel*, 62 Cal. 411; *State v. Taylor*, 7 Idaho, 134, 61 Pac. 288; *State v. Anthony*, 6 Idaho, 383, 55 Pac. 884; *People v. Lee Chunck*, 78 Cal. 317, 20 Pac. 719; *State v. Tennison*, 42 Kan. 330, 22 Pac. 429; *Smith v. People*, 8 Colo. 457, 8 Pac. 920; *People v. Ah Len et al.*, 92 Cal. 282, 27 Am. St. Rep. 103, 28 Pac. 286; *Newby v. People*, 28 Colo. 16, 62 Pac. 1035; *People v. Vallier*, 127 Cal. 65, 59 Pac. 295.) In a criminal prosecution, the conversations and statements of third parties not made in defendant's presence or hearing are incompetent. (*People v. Wilmot*, 139 Cal. 103, 72 Pac. 838.)

John A. Bagley, Attorney General, for the State.

In the case at bar the defendant was permitted to cross-examine the witness, Anna Uhri, in regard to these matters, but when he undertook to prove by other witnesses, as part of his case, that the witness, Anna Uhri, had been found in bed with her brother in June, 1902, then the court excluded the testimony. They were trying the case of Harness for rape upon his sister in law and not the case of Anna Uhri for illicit cohabitation with her brother. They have not brought the matter under the rule of impeachment as laid down by our statute or under any other rule of evidence. (Code Civ. Proc., secs. 4490, 4491; *Anthony v. State*, 6 Idaho, 383.) Prosecuting attorney in a criminal case may properly declare to a jury that the evidence convinces him beyond a reasonable doubt that the prisoner is guilty. (2 Ency. of Pl. & Pr. 726, cases cited, note 2.) In *State v. Jefferson*, 43 La. Ann. 995, 10 South. 199, the prosecuting attorney said: "If juries did not convict people who have been so clearly shown to be guilty as this defendant has been, you might as well tear down the courthouse." Held not reversible error. In *Scott v. State*, 7 Lea, 235, the attorney general said to the jury: "If the juries don't punish, the people will rise up and punish it." Held reprehensible,

but not reversible, error. Matters of common and general information and matters of known and settled history may be referred to in argument by way of illustration or emphasis with entire propriety, though they are not strictly pertinent to the issue. (2 Ency. of Pl. & Pr., cases cited, note 4; *Northington v. State,* 14 Lea, 424; *State v. Phillips,* 117 Mo. 389, 22 S. W. 1079; *State v. Elvins,* 101 Mo. 243, 13 S. W. 937; *Heyl v. State,* 109 Ind. 589, 10 N. E. 916; *Combs v. State,* 75 Ind. 215; *Turner v. State,* 89 Tenn. 547, 15 S. W. 838; *State v. Jefferson,* 43 La. Ann. 995, 10 South. 199.) In prosecutions for rape it may be said to be universally conceded that the state may, on the direct examination of the prosecutrix, prove the fact that she made complaint of the injury, and when and to whom, and she may be corroborated by the persons to whom she complained as to the same fact. (Rice on Criminal Evidence, 826, cases cited.)

STOCKSLAGER, J.—This is an appeal from the district court of Nez Perce county. The county attorney filed an information in said court charging the defendant with the crime of rape, to wit: "On the twelfth day of February, 1903, at the county of Nez Perce, in the state of Idaho, the aforesaid David Harness then and there being committed the crime of rape by then and there feloniously, with force and violence making an assault upon one Rosa Harness, who was not then and there the wife of the said David Harness, and did then and there feloniously ravish and carnally know and accomplish with her, the said Rosa Harness, an act of sexual intercourse by force, violence, and against her will and resistance, contrary to the form of the statute in such case made and provided."

The defendant was tried upon this charge and on the seventh day of November, 1903, found guilty of the crime of rape. On the seventeenth day of November he was sentenced to a term of fourteen years in the state penitentiary. On the twenty-seventh day of February, 1904, an order was made and entered thereafter by the court, overruling defendant's motion for a new trial. On the second day of March, 1904, defendant perfected his appeal from the judgment; also from the order overruling the motion for a new trial.

Defendant assigns thirty-six errors occurring on the trial and in the order overruling his motion for new trial. Counsel for appellant in his brief discusses assignments 3, 10, 12, 15, 16, 17, 19, 20, 21, 22 and 23 together as one assignment, stating they relate to the same thing and are substantially the same. It is disclosed by the record that William Harness, brother of the defendant, was living with his wife, Rosa Harness, the woman upon whom the alleged assault and offense of rape was committed, in Nez Perce county. It is also shown that Anna Uhri and Frank Uhri, brother and sister of Rosa Harness, made their home with their sister and husband. Prior to moving to the William Harness homestead they had lived upon the homestead of defendant adjoining the homestead of William. Friendly relations had existed between Anna Uhri and defendant, and they were engaged to be married. This engagement seems to have been terminated in May or June, 1902. Defendant and Frank Uhri had been on friendly terms until about the time last indicated. It is shown that the house of William Harness contained two rooms, one above and one below, and that there was a bed in each room. Anna Uhri testified that her sister and husband occupied the lower room and that she occupied the upper room; also her brother Frank slept upstairs.

Counsel for appellant offered to show by Nancy Harness, mother of defendant and William Harness, that about the time the engagement was terminated between defendant and Anna Uhri, that she went to the upstairs room of her son William and found Anna Uhri and her brother Frank in bed together, and she immediately reported her discovery to defendant, who went upstairs and threw Frank out of bed, upbraiding him for his conduct. That Frank came downstairs and was sullen and angry about his treatment from defendant, and that thereafter the relations between Frank Uhri and defendant were unfriendly. Counsel offered to prove the same state of facts by the younger brother, Ed. Harness, who it is shown was present at the time above indicated. Before offering to prove the above state of facts, counsel for appellant stated to the court that the theory of the defense was that there was a conspiracy on

the part of Frank Uhri, Anna Uhri and Rosa Harness to charge defendant with the crime of rape and send him to the penitentiary. Defendant did not deny that he had been unduly intimate with Rosa Harness on two occasions, but said there was no force or violence used, and that the act of sexual intercourse was entirely voluntary on her part.

Under this statement of facts, should the court have permitted the witnesses to testify as to the past conduct of Anna Uhri and Frank Uhri?

Our attention is called to a recent decision of the supreme court of Kansas. (*State v. Abbott,* 65 Kan. 139, 69 Pac. 160.) "John Abbott was prosecuted upon the charge of rape committed on the person of Desdemonia Horrolson, a girl under eighteen years of age, and he was convicted of an attempt to commit that offense. Mrs. Sadie Stutzman was the mother of the girl and the prosecuting witness. It is claimed that the defendant and Mrs. Stutzman had been unduly intimate for several months prior to the commission of the alleged offense, and that their illicit relations had been brought to the knowledge of her husband; that Mrs. Stutzman met the defendant in the woods near her house in the absence of her husband and demanded money from the defendant, which was not furnished; and that then she began the prosecution against the defendant for the offense against her daughter. She claims to have known of the alleged offense within a few hours after its commission, and it is said she made no complaint for more than a month, nor until the demand for money was refused. It is claimed by defendant that the prosecution was malicious. . . . . After she had testified in behalf of the state, she was asked on cross-examination if it was not a fact that from October of the previous year until a few days before demanding the money from the defendant, she had met him in the timber near the house and had illicit relations with him; but the court, on objection of the county attorney, excluded the testimony. . . . . It was competent for the defendant to cross-examine the witness as to her antecedents, character and past conduct, and thus impair her credibility. This line of inquiry became important because of the contention that the prosecution was

prompted by the malice of this witness resulting from a failure to extort money, and some of the circumstances surrounding the case seem to justify a full cross-examination as to her past conduct and character."

The same court, in *State v. Greenburg,* 54 Kan. 161, 53 Pac. 61, lays down the rule in the syllabus as follows: "For the purpose of proving the character and credit of a witness, he may be cross-examined as to specific facts tending to disgrace or degrade him, although collateral to the main issue, and touching on matters of record. Such an inquiry is only allowed for the purpose of honestly discrediting the witness, and there is reason to believe that it will tend to the ends of justice." In support of this rule this case cites *State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406; *State v. Probasco,* 46 Kan. 310, 26 Pac. 749; *State v. Wells,* 54 Kan. 161, 37 Pac. 1005; *State v. Park,* 57 Kan. 431, 46 Pac. 713; *Hanoff v. State,* 37 Ohio St. 178, 41 Am. Rep. 496; *Brandon v. People,* 42 N. Y. 265.

The attorney general insists that the witness, Anna Uhri, did not come within the rule laid down in the cases above referred to, and in support of his contention cites sections 6082 and 6083, Revised Statutes of Idaho; also *State v. Anthony,* 6 Idaho, 383, 55 Pac. 884.

Section 6082 says: "A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth, honesty or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony."

Section 6083 provides that: "A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

It will be seen that these sections have no application to the case at bar. There was no attempt to contradict any statement of the witness, or to show that her general reputation for truth and veracity was bad. It had been shown that Anna Uhri was the sister of Rosa Harness and that Frank Uhri was the brother. That Frank Uhri was the complaining witness against the defendant; that an engagement of marriage existed between Anna Uhri and defendant; that such engagement was terminated after it was alleged to have been discovered that Anna Uhri occupied the same bed with her brother Frank; that at the time of such alleged discovery it was claimed defendant went to the bed and ejected Frank therefrom, using violent language and considerable force in doing so; that thereafter Frank and defendant were not on friendly terms. It was shown that the evidence was offered for the purpose of showing the animus and ill-will of witness Anna Uhri toward defendant, and not for the purpose of impeachment, or contradicting any former statements she may have made.

*State v. Anthony,* cited by the attorney general, has no application. In that case it is said by the court: "An attempt was made to discredit and impeach the defendant, by contradicting him in regard to a particular act that had not the remotest connection with the crime of which the defendant was charged and convicted. An attempt was made to discredit the witness on a matter entirely irrelevant to the issue then being tried. After a careful review of the record and an examination of all the authorities cited, we are of the opinion that the court should have permitted this evidence to go to the jury to aid them in determining whether the prosecution was in good faith, or to gratify a feeling of malice and revenge on the part of the witness, Anna Uhri."

Assignments Nos. 24, 25, 26, 27, 28, 29, 30, 31, 32, 33 and 34 are grouped together and argued as one assignment by counsel for appellant, under the head of misconduct of the county attorney in his argument of the case to the jury and errors of law wherein the court permitted such argument. The county attorney was permitted to say: "Gentlemen of the jury, I say to you now that if you are ever called upon to meet with such

a circumstance as this, that you take your gun and blow his brains out, and I as a prosecuting officer will never prosecute you for it. If the court orders me to do so, I will resign my office." Again: "Gentlemen of the jury, it is no wonder the people of the south are often provoked to take the law in their own hands in such cases as this. The people in such cases are justified in taking the law in their own hands. It is no wonder they string people up by the neck for such crimes." Again: "Think of this woman there alone with this brute, she calling upon God to help her on one side, and 'God d———n you' on the other!" Again: "Gentlemen of the jury, it is no wonder that the people of the south take the law in their own hands. When such emergency arises, they are justified in taking the law in their own hands. If that brother had done his duty, he would have taken his gun and went down to defendant's home and blown his brains out, . . . . and if he had done that, I, as prosecuting officer, would never have prosecuted him for it. . . . . I repeat it, gentlemen of the jury, any man is justified in taking the law in his own hands under such circumstances."

It is shown by the record that counsel for defendant objected to each and all of these statements, which objections were over-ruled by the court with the statement that "It is a conclusion drawn by the attorney from the evidence. You should not interrupt the county attorney in his argument; the court will allow you an exception to all remarks prejudicial to the defendant at the conclusion of the trial, or in case you propose a statement."

It is clear to us from the argument of the county attorney that he was filled with enthusiasm and unquestionably made statements that ordinarily he would not make, being the prosecuting officer of his county. We do not believe he would advise or encourage mob violence; under any conditions such advice would be dangerous to the peace and good order of the state. His oath of office as the prosecuting officer of Nez Perce county requires him, among other things, to prosecute all persons charged with violating any of the laws of the state within his jurisdiction, and he, as such prosecuting officer, could not justify his remarks to the jury. It is immaterial what prompted

him to the use of such language; there is no excuse for it, and its effect could only tend toward prejudicing the jury against the defendant. The fact that the defendant was charged with one of the most revolting crimes known to humanity does not close the doors of the courts to him. He is entitled to a fair and impartial trial by an unbiased and unprejudiced jury, and it was and is the duty of the court, aided by the prosecuting officer, to surround him with the safeguards of the law. All men are presumed to be innocent until the contrary is shown, and this presumption shields the humblest as well as the most depraved citizen when charged with crime.

The court erred in the statement that "It is a conclusion drawn by the attorney from the evidence. You should not interrupt the county attorney in his arguments. The court will grant you an exception to all remarks prejudicial to the defendant at the conclusion of the trial." It was the only time counsel for the defendant could protect his client from the danger of the statements of the prosecuting officer. The injury, if any, was in allowing the remarks to go to the jury. After the close of the trial it would only be effectual in this court, unless the court meant to convey the idea to counsel for defendant that after the close of the argument he would call the attention of the jury to the remarks of the county attorney and instruct them that in their deliberations they must not be influenced by such remarks. The record does not disclose that such was done, hence we infer that they went unchallenged so far as the jury was concerned.

Can it be said that the statements of the county attorney that men charged with or guilty of the crime for which defendant was upon trial should be strung up by the neck, or have their brains blown out; that he would blow his brains out under similar circumstances, and if the husband had done his duty he would have taken his gun and blown his brains out; that he as a peace officer of the county would not prosecute one for such an offense—had no weight with the jury? We think not. In a very recent decision of this court in *State v. Irwin,* reported in 9 Idaho, 35, 71 Pac. 608, 60 L. R. A. 716, the defendant was convicted of the crime of rape. In speaking of the duty of

the prosecuting officer in the trial of criminal cases, the syllabus says: "It is the duty of the prosecutor to see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury; and above all things he should guard against anything that would prejudice the minds of the jurors and tend to hinder them from considering only the evidence introduced. He should never seek by any artifice to warp the minds of the jurors by inference and insinuations." Many authorities are cited and discussed in support of this rule by Mr. Justice Ailshie, who wrote the above opinion. We do not deem it necessary to cite further authorities on the question. It is sufficient to say that none can be found that would uphold a judgment under the conditions shown by the record in this case.

The attorney general cites 2 Encyclopedia of Pleading and Practice, 726. This language is used: "Prosecuting attorneys in a criminal case may properly declare to a jury that the evidence convinces him beyond a reasonable doubt that the prisoner is guilty." There was certainly nothing objectionable to this statement.

In *State v. Jefferson,* 43 La. Ann. 995, 10 South. 199, the prosecuting attorney said: "If juries did not convict people who have been so clearly shown to be guilty as this defendant has been, you might as well tear down the courthouse." This again was only his conclusion of what the evidence established.

In *Scott v. State,* 7 Lea, 233, the attorney general said to the jury: "If juries don't punish crime, the people will rise up, and should rise up and punish it." This was held reprehensible, but not reversible, error. No promises here that if the people will take the law into their own hands they shall have immunity from the prosecuting officer of the county or state.

We have examined all the other authorities cited by the attorney general and find that they do not apply to the case under consideration.

The third error complained of relates to the failure of the court to instruct the jury on its own motion that "the defendant was presumed to be innocent until he was proven guilty."

The statute makes it the duty of the court to instruct the jury on all material issues, and it was undoubtedly an oversight on the part of the court that this instruction was not given.

Assignment No. 4 is based upon the severity of the sentence imposed upon the defendant to fourteen years' imprisonment, counsel for the appellant insisting that the evidence in the case does not warrant severe punishment. We express no opinion on this assignment.

Assignment No. 11 relates to a question asked William Harness, the husband of Rosa Harness, to wit: "Did you see any marks or bruises on her body?" This question was objected to by the county attorney and the objection sustained by the court. This was error, as other witnesses had testified to seeing marks and bruises on her person, and counsel for appellant had the right to interrogate the husband while upon the stand relative to such marks and bruises.

We find no error in the ruling of the court set out in assignment No. 2. The question was propounded to Rosa Harness, to wit: "You didn't discover you had been raped until the next day, did you?" It would seem that this question was more for the purpose of humiliating the witness than to elicit the facts in the case, and an objection to it was properly sustained.

Assignment No. 4 is based on the cross-examination of Rosa Harness relative to certain changes that had been made in her evidence before the committing magistrate. It was shown that the changes were not made in the presence of defendant. The question was: "This question you did not change, did you? You talked this all over with the county attorney? Didn't you answer, 'Yes, sir'? You didn't change that question, did you?" The county attorney objected to this question, which was sustained by the court. This ruling was error.

Assignment No. 35 is based upon a question to witness, Anna Uhri, to wit: "And what else did she say? Anything else besides?" Counsel for appellant objected to this question, which was overruled by the court, and the witness answered detailing the conversation between herself and sister. This was error.

On this subject Mr. Underhill, in his very excellent work on Criminal Evidence, section 409, says: "The fact that the

victim of a rape was weeping, or that she made immediate com-- plaint, as well as when she made it, and to whom, being material and relevant to show the commission of the crime, may be proved as original evidence on the direct examination of the prosecutrix, or of any other witness. It may be shown that the complaint was made and that some person was accused who must not be named. But the details of what the prosecutrix said cannot be proved on the direct examination, unless the complaint is so clearly connected with the time or place of the crime as to form a part of the *res gestae.*"

A long list of cases are cited in support of this rule by Mr. Underhill in support of this text. *People v. Wilmot,* 139 Cal. 103, 72 Pac. 838, *People v. Warren,* 134 Cal. 202, 66 Pac. 212, hold to the same rule.

The judgment and order overruling defendant's motion for a new trial must be reversed and new trial ordered.

Sullivan, C. J., and Ailshie, J., concur.