(November 11, 1905.)

## STATE v. BURKE.

[83 Pac. 228.]

BURGLARY—CIRCUMSTANTIAL EVIDENCE—INSUFFICIENCY OF EVIDENCE.
  1. Evidence in this case examined and reviewed and held insufficient to support a verdict and judgment of conviction.
(Syllabus by the court.)

APPEAL from District Court in and for Nez Perce County. Honorable Edgar C. Steele, Judge.

Defendant was informed against and charged with the commission of the crime of burglary. From a judgment of conviction and an order denying a motion for a new trial defendant appealed. Reversed.

F. E. Fogg and George W. Tannahill, for Appellant.

Each essential link in the chain of circumstances is the rule where the evidence is entirely circumstantial. (*People*

v. *Phipps*, 39 Cal. 326; *People v. Ah Chung*, 54 Cal. 403; *People v. Smith*, 106 Cal. 73, 39 Pac. 40; *Schusler v. State*, 29 Ind. 394; 23 Ency. of Law, 2d ed., 951; 1 Greenleaf on Evidence, sec. 34.)

J. J. Guheen, Attorney General, Edwin Snow and F. S. Wettach, for Respondent.

The facts proven are, in the light of the cases, entirely sufficient to sustain the verdict. As bearing out this contention, we call the court's attention to a number of cases involving somewhat similar circumstances. (*People v. Sears*, 119 Cal. 267, 51 Pac. 325 (a case somewhat analogous to the one under consideration); *People v. Arthur*, 93 Cal. 536, 29 Pac. 126; *Harris v. State*, 84 Ga. 269, 10 S. E. 742; *People v. Wood*, 99 Mich. 620, 58 N. W. 638; *Burks v. State*, 92 Ga. 461, 17 S. E. 619; *Gregory v. State*, 80 Ga. 271, 7 S. E. 222; *State v. Tucker*, 36 Or. 291, 51 L. R. A. 247, 61 Pac. 894; *Magee v. People*, 139 Ill. 138, 28 N. E. 1077; *Harris v. State*, 61 Miss. 304; *Davis v. State*, 76 Ga. 16; *State v. Moore*, 117 Mo. 395, 22 S. W. 1086.) Possession of stolen property, together with other evidence, is uniformly held to be sufficient to justify a conviction. (*Ryan v. State*, 83 Wis. 486, 53 N. W. 836.)

AILSHIE, J.—The defendant, David W. Burke, was charged upon information jointly with his father, George Burke, with the crime of burglary. He entered the plea of not guilty, and upon a separate trial was convicted of burglary in the first degree and sentenced to a term in the penitentiary. All the evidence produced by the state upon the trial was substantially as follows: That George Burke, the father of the defendant, was residing upon a farm near the town of Mohler, in Nez Perce county, and the defendant, who had been stopping with his father for a couple of weeks, was employed to assist in the farm work, but had no interest in the farm or the business nor in any of the property about the farm, except as an employee. Upon an adjoining farm was situated a farmhouse and granary belonging to

one L. M. Englehorn. On the night of April 9, 1904, the granary, which up to that time had contained a considerable quantity of barley and oats, was burned. It is not known at what hour in the night the fire occurred, but about 7 o'clock the next morning it was discovered the building had been burned. Englehorn and other neighbors who gathered in the next morning discovered the tracks of a man from the granary to the road, and it appeared that the person had made frequent trips back and forth, and they also found the track of a wagon that had driven up during the night and where sacks had been placed on the ground previous to loading. The tracks of the wagon were much heavier from the time they left the place where the grain appeared to have been loaded than they were in driving up to the gate. They followed these tracks from that point on along the public highway to where they turned into the residence of George Burke. Following these tracks they found the wagon at George Burke's place, and on the floor of the wagon-box found some scattered barley. They also found twenty or twenty-five sacks of barley in George Burke's granary which did not belong to him and which he did not claim. They also found some pony tracks in the neighborhood of the burned granary which were identified as being very similar to the tracks made by a pony which the defendant, David Burke, rode on the following day. This pony did not appear to belong to the defendant but had been kept on the Burke place and really did not appear to belong to any of the Burke family. It seems uncertain, in fact, as to who was the owner of the pony—probably a young woman whom defendant married later. George Burke, who was jointly indicted with his son, was placed on the stand by the state and testified that he retired about 6 o'clock on the evening of April 9th, and that he knew of nothing that occurred between that and the next morning. He testified that he and his son were at home that night; that somebody had been killing his horses and that during the last two or three weeks he had had six horses and two hogs killed at nights, and that the horses had been killed by being stabbed just back of the ribs; that he

had been up three or four nights watching the horses to keep anyone from injuring them, and that on this evening he was very tired and sleepy and retired early and sent his son, David Burke, to the barn to watch the horses; that on the morning of April 10th, when some of the neighbors came and inquired as to how much grain he had in his granary, he told them he thought he had about forty sacks in there, and that after an examination was made it was found there was twenty or twenty-five sacks of barley in the granary that he did not claim and did not own. He testified he did not know how the barley came into his granary. The defendant's stepmother testified on the part of defendant that defendant went to the barn early in the evening to watch the horses that night and that he returned· to the house about 11:30 o'clock, and came into her room to get a lamp and lighted it and went upstairs to bed, and that to the best of her knowledge he did not leave his room until about 6 o'clock the next morning. Defendant testified that he stayed at the barn and watched the horses until about 11:30, when he came to the house and went to his room and went to bed, and that he had never been on Englehorn's place; had never been at his granary; that he knew nothing about the grain nor the burning of the granary. It also appeared that a considerable amount of grain, anywhere from fifty to one hundred sacks, remained in the granary and was still burning and smoldering the next morning when it was discovered that the granary had been burned. It was shown with reasonable certainty· that from fifteen to twenty-five sacks of barley had been hauled on the night of the fire from the Englehorn granary to George Burke's granary and placed in the latter granary, and that the hauling was done on George Burke's wagon. There is no evidence tending to show with whose team the hauling was done. George Burke testified that he had one pretty good wagon harness but that the breast straps had been loaned and that one of the tugs was broken, and that all the other harness he had was plow harness. One witness testified that he passed the Englehorn premises between 11 and 12 o'clock the night of April

9th, and that the building was standing at that time, and that he reached home as the clock struck 12. It appears that the defendant and Englehorn had had no dealings with each other and were practically unacquainted. Englehorn testifies that he knew the defendant only by sight. So far as shown by the record, the defendant never made any claim upon this grain and never made any claim to having any grain on his father's place or in the granary, and it is not shown that he ever made any other or different statement than that he knew nothing about the removal of the grain or the burning of the granary. It also appears that previous to the trial on the charge of burglary that he had been tried upon the charge of arson for burning the granary and had been acquitted by a jury. The state showed by defendant on his cross-examination that he had been previously convicted of a felony in the state of Washington. This was done apparently for the purpose of impeaching the witness. The foregoing contains the substance of every fact and circumstance shown upon the trial.

Counsel for defendant took exceptions to various statements made by the prosecuting attorney upon the argument of the case before the jury, in which the prosecutor referred to the defendant as a man who had "shown himself not to be a law abiding citizen," and also to the statement where the prosecutor said: "Counsel wants to know who killed the horses; I do not know who killed the horses; it may have been that the man who killed the horses was the man who stole the grain. But, gentlemen of the jury, I want to say to you that if this was the case, then the man who killed the horses was David Burke." And again, the prosecutor said: "He went over to Fletcher the next day, counsel said to see his sweetheart. It might have been to see his sweetheart, or it may have been to arrange for the sale of this grain." The defendant through his counsel excepted to these various statements made by the prosecuting attorney upon the ground that there was no evidence in the record upon which to found such statements or argument, and that they were done purely for the purpose of prejudicing the jury

against the defendant. In view of the evidence which had been introduced in this case, these statements coming from the prosecuting attorney were, in a measure, calculated to prejudice the minds of the jurors. (*State v. Irwin,* 9 Idaho, 35, 60 L. R. A. 716, 71 Pac. 608; *State v. Harness,* 10 Idaho, 18, 76 Pac. 788.) They are not of such a character, however, as would call for a reversal of the judgment. (*State v. Harness, ante,* p. 122, 80 Pac. 1129.) Upon the sufficiency of the evidence, or rather lack of evidence, in this case, a more serious question arises. The fact that a burglary was committed is admitted, but we have searched the record in vain to find any circumstance connecting this defendant with the commission of the offense. The evidence introduced is in no respect inconsistent with the defendant's innocence. It may be also said that it is consistent with his guilt. That is in a sense true, and in the same sense it is just as consistent with the guilt of any other citizen living in the neighborhood of the Englehorn premises. It is true the grain was found in the granary belonging to defendant's father, but in the absence of any showing whatever that the defendant was exercising control or dominion over this granary or had been in the habit of keeping grain or any other property in the granary, it would be quite a stretch of legal principle to say that this constituted a possession of the stolen property by the defendant. He never made any claim to the grain nor assumed to deal with it in any manner, nor has it been shown that he even knew the grain was there. The well-established rule of law is, that the evidence must not only be consistent with the guilt of defendant, but it must be inconsistent with his innocence. We agree with the prosecuting attorney that it is probable that the man who had been killing the old man Burke's horses and hogs was the same person who burglarized the Englehorn granary, but there is not an intimation in the evidence that the defendant had been killing his father's stock, and, indeed, every consideration would lead to the conclusion that whatever criminal turn of mind the defendant might have he would not have committed this offense against the property of his own father

while in his father's employ and on apparently friendly terms with the family.

The attorney general has called our attention to *People v. Sears,* 119 Cal. 267, 51 Pac. 325, *People v. Arthur,* 93 Cal. 536, 29 Pac. 126, *Harris v. State,* 84 Ga. 269, 10 S. E. 742, *People v. Wood,* 99 Mich. 620, 58 N. W. 638, *Burks v. State,* 92 Ga. 461, 17 S. E. 619, *Gregory v. State,* 80 Ga. 271, 7 S. E. 222, *State v. Tucker,* 36 Or. 291, 51 L. R. A. 247, 61 Pac. 894, as similar cases sustaining verdicts on evidence which he thinks as meager as in this case. Upon an examination of these cases, it will be seen that there were some specific circumstances pointing directly to the defendant in each case.

In *People v. Sears,* part of the goods were found in defendant's pocket, and the defendant gave an improbable and unsatisfactory account of how he came into possession of the property.

In *People v. Arthur,* footprints were traced from the building burglarized to a vacant building where both defendants were found asleep and the goods stolen, together with some burglary tools concealed near them, were in the building; and other circumstances were shown pointing directly to the defendants.

In *Harris v. State,* the defendant was seen near the place about the time of the burglary and tracks testified to as being the defendant's were found leading from the burglarized place to his house and the goods were found in the defendant's possession.

In *People v. Wood,* there was evidence that the defendant was seen going in the direction of the building burglarized, and the property was found in his actual possession.

In *State v. Tucker,* tracks were traced from the place of the burglary to within a very short distance of the place where defendant lived, and a letter addressed to defendant was found along the line of tracks, and the defendant later sold the property which was identified as the property which had been taken from the burglarized building.

In *Gregory v. State,* there was the most meager evidence to be found in any of these cases, but even there it was

shown that the person who had committed the crime made a peculiar track, and the defendant volunteered upon the trial to make a track in a box of sand in the presence of the jury, and this track corresponded exactly with the track previously described by the witness. In that case, however, Chief Justice Bleckley, the distinguished Georgia jurist and humorist, in a page and a half opinion, took occasion twice to observe that the case was one of considerable doubt.

We conclude that the utter absence of evidence in this case connecting the defendant with the commission of the offense makes it necessary for us to grant a new trial. Whether or not the defendant is a man capable of committing such an offense or has paid the penalty for the commission of an offense in another state, he is nevertheless entitled to a fair trial, and if guilty to be convicted upon evidence and not upon insinuations and innuendo. The administration of even-handed justice demands it, and the law will sanction no other kind of a conviction. It is not enough to say a crime has been committed and somebody has committed it, and that somebody shall pay the penalty therefor, and that the state has been unable to find any other person upon whom they could fasten the crime, and that it is entirely possible and was altogether convenient for the defendant to have perpetrated the offense. Something more must be done; facts or circumstances should be developed tending to connect the defendant with the commission of the offense such as would be inconsistent with the actions and conduct of an innocent man. Since this case must be sent back for a new trial, it becomes necessary for us to consider the assignments of error with reference to the admission and exclusion of evidence and the instructions given and rejected.

After examining the rulings complained of in the admission and exclusion of evidence, we are satisfied no error has been committed. It does appear, as contended by counsel, that the trial court was rather strict with defendant when cross-examining the state's witnesses.

The instructions, when examined and read as a whole, appear to fairly state the law of the case and to cover all the points on which defendant made special requests.

Judgment reversed and a new trial granted.

Stockslager, C. J., and Sullivan, J., concur.