(No. 5972.   May 13, 1933.)

STATE, Respondent, v. A. C. CARLSON, Otherwise Known
as JACK CLINE, and MALCOLM BENTLEY, Ap-
pellants.

[22 Pac. (2d) 143.]

140

Delana & Delana, for Appellants.

George F. Hansbrough, Prosecuting Attorney, for Respondent.

WERNETTE, J.—Appellants were convicted of the crime of forgery and have perfected an appeal to this court. The information charges:

"The said A. C. Carlson, otherwise known as Jack Cline, and Malcolm Bentley on or about the seventh day of May, 1932, at the county of Bingham, and the State of Idaho, and prior to the filing of this information, did then and there willfully, unlawfully, feloniously, knowingly, falsely, and fraudulently, and with intent to prejudice, damage and

defraud J. N. McCracken stores of Blackfoot, Idaho, make, alter, forge, and counterfeit a certain instrument in writing, in the words and figures following, to-wit:

"Blackfoot, Idaho, May 7, 1932. No. ——.
"1st National Bank. 92–63

12

"Pay to the order of Jack Cline Twenty-seven and No/100 Dollars for Pelts.

"SIDNEY SHOELLS.

and which instrument was then and there endorsed on the back 'Jack Cline'; and they, the said A. C. Carlson, otherwise known as Jack Cline, and Malcolm Bentley, then and there well knowing the same to be false, altered, forged, and counterfeited, did then and there, to-wit, on the seventh day of May, 1932, at Blackfoot in the said county of Bingham, willfully, feloniously, knowingly, and fraudulently, and with intent to prejudice, damage, and defraud said J. N. McCracken stores, utter, publish, and pass the same as genuine and true to J. N. McCracken Stores, in Blackfoot, Idaho. . . . . ''

Where necessary we will refer to the facts and the record in considering the various assignments of error complained of.

We will first consider the case as to appellant Bentley. It is conceded that his conviction was based entirely on circumstantial evidence.

Appellants shortly after the commencement of the trial moved that the state be required to elect whether it would stand on the charge of making, altering, forging and counterfeiting the check set out in the information, or for uttering, publishing and passing the same. The court reserved its ruling until the conclusion of the state's case, at which time the appellants renewed the motion, which was granted by the court; the state electing to stand on the charge with reference to the uttering, publishing and passing of the check. At the close of the state's case, and after the state was required to elect on which charge it would stand, ap-

pellants, jointly and severally, moved the court to dismiss the action and discharge the defendants, for the reason that the state had failed to make out a *prima facie* case, or any case sufficient to warrant the court in submitting the same to the consideration of the jury; pointing out in the motion the failure of proof in that regard. The motion was overruled. Appellants' specifications of error, numbers 1 and 2, are as follows:

"I.

"The Court erred in denying the motion of the defendant, Malcolm Bentley, to dismiss the action and discharge said defendant.

"II.

"The verdict of the Jury and the judgment of the Court is against the law, because the evidence is insufficient to support the verdict of the Jury, and insufficient to support the judgment of the Court against the defendant, Malcolm Bentley in the following particulars, to-wit:

"(a) There was no evidence connecting or tending to connect the defendant, Malcolm Bentley with the passing or uttering of the alleged forged check set forth in the information, or any other forged checks.

"(b) There was no evidence that the defendant, Malcolm Bentley either aided or abetted in the passing or uttering of said check, or any checks.

"(c) There was no evidence that the defendant, Malcolm Bentley did anything to defraud the C. M. McCracken's Stores.

"(d) There was no evidence that the defendant, Malcolm Bentley had any knowledge that said check, or any checks were forged or false in any particular."

Upon a careful examination of the record we find the only evidence offered to connect appellant, Bentley, with the alleged crime, is substantially as follows: Both appellants were observed by the witness Norman Loeppke, looking in the window of McCracken's Store at Blackfoot, Idaho, about 7:30 P. M. on May 7, 1932, for a period of about one-half hour; Carlson then entered the McCracken Store and Bent-

ley left; later that evening, about 9:30 o'clock, Bentley was again observed in front of C. C. Anderson's Store in Blackfoot, from which place he walked to the front of Dustin's Drug Store, where he stood for a period of from ten to fifteen minutes, where he was watching, very closely, the Safeway Skaggs Store across the street, at which time he was holding a couple of boxes, such as ofttimes contain underclothes or union suits, and also a package rolled up in brown paper. From the last-named place he went to the front of the McCracken Store, where he again looked in the windows; he then left and was not observed any further that evening. The next day both appellants were placed under arrest near Idaho Falls, Idaho, at which time they were wearing new shoes, corduroy pants, and Bentley was wearing new underclothes, all were òf the same kind and make that were sold to Carlson the evening before at the McCracken Store and other business places in Blackfoot, where Carlson paid for the articles so purchased with the alleged forged check and other checks, claimed to be forgeries. The identification marks, consisting of size, stock number and name of manufacturer, in the new shoes which both appellants were wearing at the time of the arrest, had been removed. The above is the only evidence offered to connect Bentley with the crime, other than some statements made by Carlson while making the purchases at the various stores on the evening of May 7th, not in the presence of Bentley.

When Carlson entered the McCracken Store, about 7:30 on the evening of May 7th, after having been seen with Bentley looking in the window, he purchased a bill of goods from Norman Loeppke, who worked in the store, consisting of two shirts, two pairs of overalls, and two pairs of shoes, the total cost of which was $12.28. He gave in payment the check for $27 set out in the information, receiving the balance in cash. He stated to Loeppke that his name was Jack Cline, indorsing the name of Jack Cline on the back of the check. Loeppke, at that time, was familiar with the signature of Sidney Shoells of Blackfoot, Idaho; he believed

the signature to be the genuine signature of Sidney Shoells. Part of the testimony of Loeppke, with regard to the check and the conversation he had with Carlson, is as follows:

"Q. And what did you do with this check?

"A. Took it,—it wasn't indorsed,—I handed it back to him and I said to him, I says, 'Who is Sidney Shoells?' He says, 'Don't you know him? He is a pelt buyer, or a fur dealer,' or something like that, and he signed the check. . . . . "

.   .    .    .    .    .    .    .    .    .    .

"Q. Now Mr. Loeppke, you testified yesterday in the matter that when Mr. Carlson came into the store, when he purchased those shoes, there was some conversation that took place between you at that time?

"A. Yes, sir.

"Q. You remember that. Now, I will ask you if there was any conversation between you and Mr. Carlson at that time with reference to the purchase of these shoes, and why he bought two pairs of shoes of different sizes,—I will put it that way?

"A. Yes, sir.

"Q. State what that was.

"A. Mr. Carlson wanted to buy two pairs of shoes like this pair of tan shoes. I only had the size he wanted in one pair, so he decided to take the black ones.

"The Court: Yes. State what was said. That is the question.

"A. He took the black ones and said if they didn't suit his partner he would bring them back. I told him it would be all right. That is about all that was said that I can remember.

"Q. What did he say, if anything, with reference to the tan pair of shoes? He bought those first, did he? I am not clear on that.

"A. Yes, he bought the tan shoes, and they were all right, and he wanted another pair just like them in the size larger.

"Q. Yes.

"A. Which we didn't have, so I sold him a black pair and he asked me if he could return them if they didn't suit his partner, or if they didn't fit."

He also stated that the shoes appellants were wearing at the time of the arrest were of the same color, size and make that he sold Carlson the evening before, and without objection, that he ascertained the fact next day that the check given to him by Carlson was a forgery.

Late in the afternoon of May 7th, Carlson also appeared at the store of C. C. Anderson, at Blackfoot, where he purchased, from a clerk named Leonard Green, one pair of corduroy pants and some underwear, the total cost of which was $5.50, which he paid by check in the sum of $17, receiving the balance in cash, which check bore the name of Sidney Shoells, as maker, and Jack Roberts, as payee. Carlson represented that his name was Jack Roberts. The check was submitted to the assistant manager for approval, who stated that the signature looked like Sidney Shoells' signature, and he approved the check. Carlson indorsed the check in the presence of Green by signing the name Jack Roberts. As to the underclothes that were sold by Green to Carlson, it was suggested by Green that the same were too large, as he testified:

"Q. And you said something about the size of that underwear,—what was that?

"A. Why, he ordered a size forty-two, and that seemed so large for him, I told him I thought it would be too large. He said, yes, it was for someone else."

The witness also testified that the trousers and underclothes Bentley was wearing shortly after his arrest were of the same kind and character that he sold Carlson on May 7th.

On the night of May 7th, Carlson also appeared at the Safeway Store in Blackfoot and purchased some groceries from a witness named T. M. Houk, amounting to about $3, paying for the same by check in the sum of $16, bearing the name of Sidney Shoells as maker and Phil Scott as payee, Carlson representing that his name was Phil Scott.

The check was presented to the manager and was approved by him, Carlson receiving the balance of the amount of the check in cash.

The same evening Carlson also appeared at the store of O. P. Skaggs at Blackfoot, and purchased some groceries from G. A. Page, in the amount of $3, for which he paid with a check in the sum of $19, bearing the name of Sidney Shoells, as maker, and Frank Ray, as payee. Page asked Carlson if he knew Shoells, to which Carlson replied that he did and that the name on the check was that of Shoells. The check was indorsed with the name of Frank Ray when it was presented to Page. Page knew the signature of Sidney Shoells of Blackfoot and believed the signature on the check to be genuine. He testified:

"Q. Did you know, or had you seen the signature of Sidney Shoells before that?

"A. I had.

"Q. Did you examine the signature on this check?

"A. I looked at it, and it looks fairly the same as his does.

.     .     .     .     .     .     .     .     .     .     .     .

"Q. Now, you say you sold this bill of groceries when the check was presented to you on the belief that the signature of Sidney Shoells was genuine and true?

"A. I did.

"Q. You knew his signature?

"A. I have taken his check several times.

"Q. Speak up a little, will you, Witness?

"A. I say, I had taken his check several times.

"Q. And you thought at that time his signature was on the check?

"A. I did.

"Q. And you still think so?

"A. Well, that is a doubt in my mind.

"Q. Beg pardon?

"A. That is a doubt in my mind.

"Q. In other words, you don't know that it isn't, do you?

"A. No, I don't."

Sidney Shoells, of Blackfoot, was placed on the witness-stand for the state and he testified to the effect that he was a fur and pelt dealer, and had been in and about Blackfoot for many years; that he did not sign any of the checks in question, nor had he done any business with any of the parties named as payee in the checks in evidence.

The statements made by Carlson when Bentley was not present, at the time Carlson made some of the purchases, to the effect that he was buying the same for the other fellow, or his partner, are not binding on Bentley unless the evidence establishes the fact that the appellants were acting in concert in the commission of the crime charged. We do not consider the evidence sufficient to establish such fact. All of the evidence tending to connect Bentley with the crime is sufficient to create a strong suspicion of guilt, but that is not sufficient to support conviction. The evidence was circumstantial, and in order to sustain a conviction based solely on circumstantial evidence:

"The circumstances must be consistent with the guilt of the defendant and inconsistent with his innocence, and incapable of explanation on any other reasonable hypothesis than that of guilt." (*Broshears v. State,* 17 Okl. Cr. 192, 187 Pac. 254.)

"If the evidence can be reconciled either with the theory of innocence or of guilt, the law requires that the theory of innocence be adopted." (*State v. Marcoe,* 33 Ida. 284, 193 Pac. 80; *State v. Burke,* 11 Ida. 420, 83 Pac. 228; *State v. Sorenson,* 37 Ida. 517, 216 Pac. 727.)

There is no evidence that Bentley took part in either the indorsing or the passing of the check in question, or in obtaining the goods at the McCracken Store. As to Bentley standing and looking in the window of the McCracken Store with Carlson for a period of time, that could have happened to anyone who knew Carlson, not having in mind any criminal act. The fact that Bentley, some time after the crime was committed, was looking in store windows of various business places where Carlson uttered forged checks; that undoubtedly was done by many good citizens of Blackfoot.

The fact that Bentley was with Carlson when they were arrested in itself was not criminal, nor does it prove knowledge by Bentley as to what Carlson had done; it does show acquaintanceship. The fact that Bentley was in possession of the shoes, trousers and underclothes which Carlson had purchased, from which identification marks had been removed, indicates that Bentley had shared in the fruits of Carlson's forgery, but does not show knowledge at the time the crime was committed. At the time when Carlson purchased the articles in question, Bentley may have honestly believed that Carlson had money and paid for the same in cash. There is no proof that Bentley knew that Carlson had any forged checks and paid for the articles with the same. Even though Bentley may have known that Carlson was paying for the articles with checks, he may have honestly believed them to be genuine. If Bentley did not know, at the time when Carlson passed the check in question, that it was forged, then even though he knew later that the property was obtained through crime, and that the identification marks in the articles purchased were removed to avoid detection, which very reasonably could have occurred, that fact did not make him guilty of forgery. There is no evidence as to how, when or where Bentley came into possession of the boxes and bundle he was carrying the evening of May 7th, or in what kind of containers the articles were placed or how the same were wrapped, that were sold to Carlson, though all of the parties who made the sales were on the stand and testified for the state.

Bentley was probably at a disadvantage in being tried jointly with Carlson, against whom the evidence was clear and convincing. It was easy for the jury to become prejudiced and biased against Bentley, he having been found in the company of Carlson the next day in possession of some of the fruits of the crime. Applying the rule above announced, we find that the evidence is insufficient to sustain the verdict against Bentley. Having reached this conclusion, as to Bentley, the other assignments of error as to him, need not be considered.

■ Considering the case as against Carlson, we find a different situation. Only two assignments of error are urged. First, that the court erred in not requiring the state to elect on which charge it would stand, at the commencement of the trial. Second, that the evidence is insufficient to prove that the check set out in the information was a forgery, or to prove that Carlson had knowledge that it was a forgery, at the time when he passed the check at the Mc-Cracken Store.

There is no merit in the first assignment urged. This court in the recent case of *State v. McDermott,* 52 Ida. 602, 17 Pac. (2d) 343, specifically held that an information charging forgery by making a forged check, and uttering it, charged but a single offense of forgery, committed in two ways, each of which constitutes the crime, and that a defendant thus charged may be found guilty, if either he forged or uttered the check in question. (See, also, *State v. Monteith, ante,* p. 30, 20 Pac. (2d) 1023 (decision filed April 8, 1933).) Under the above ruling the state should not have been required to elect. The state having elected at the close of its case, Carlson was in no way prejudiced.

■ The second position urged by Carlson is also untenable. He earnestly contends that there is no evidence to prove that the check in question was forged; that the check may have been that of another Sidney Shoells, other than testified, and that there is no evidence to prove that Carlson knew, at the time when he gave the check for the merchandise purchased at the McCracken Store, that the same was forged.

"Ident. y of name is *prima facie* evidence of identity of person, and is sufficient proof of the fact, in the absence of all evidence to the contrary." (10 R. C. L. 877.)

And in 22 C. J. 92 we find the following quotation:

"It is an inference of fact that identity of name indicates an identity of person; and it has been held that the court itself will assume the inference to be correct in the absence of evidence to the contrary. . . . . The strength of the inference may be augmented by the fact that the name is not of

common occurrence, or that there is other identification . . . . or similarity in handwriting.''

And see, also, *State v. Herren,* 173 N. C. 801, 92 S. E. 596; *State v. Woods,* 274 Mo. 610, 204 S. W. 21; *State v. McClurg,* 50 Ida. 762, 300 Pac. 898. In corroboration of the identity of name, the four checks, on the face of each, show that they were given for pelts. Sidney Shoells lived in Blackfoot, and vicinity, for many years, during which time he was engaged in the fur and pelt business. All of the checks were drawn on the First National Bank of Blackfoot, Idaho. The signature was so near that of Sidney Shoells that two of the men to whom checks were passed, who were familiar with and knew Sidney Shoells' signature, believed the signature to be genuine at the time, and were actually deceived. Considering the further fact that in the course of a few hours Carlson represented himself to be Jack Cline, Jack Roberts, Phil Scott and Frank Ray, when he passed the four checks, and a reasonable and logical inference being that he later destroyed the identification marks on the property, the fruits of the crime, and that the handwriting of Carlson, the indorsements on the checks, was before the jury so they could compare his writing with that on the face of the checks, we hold there was ample evidence for the jury to conclude that the check in question was forged, and that Carlson knew it at the time when he passed the same. To hold otherwise would be a mockery of justice.

As to appellant Bentley, the judgment should be reversed and a new trial granted. As to appellant Carlson, the judgment should be affirmed.

It is so ordered.

Budge, C. J., and Givens, Morgan and Holden, JJ., concur.