(June 14, 1913.)

STATE, Respondent, v. WALTER M. WILLIS, Appellant.

[132 Pac. 962.]

CRIMINAL LAW—HOMICIDE—MURDER OF SECOND DEGREE—EVIDENCE—
ADMISSIBILITY—INSTRUCTIONS—CONTRADICTION.

1. Where a witness is asked a question in a criminal case, and opposing counsel objects to the same on the ground of immateriality, and the court announces that he would withdraw the evidence if its materiality was not shown, and no further action was taken by counsel for the defendant or the court in regard to the matter,

and the ruling of the court is assigned as error on appeal on the ground that the materiality of the testimony was not shown, and the evidence was prejudicial to the rights of the defendant, and it appears by the record that such evidence in no way prejudiced the jury against the defendant and in no way strengthened the evidence of the state in showing the defendant guilty, this court will not set aside the ruling of the court on appeal.

2. In a trial upon a charge of murder, where a trial court in instructing the jury repeated the definition of murder and malice in several different instructions, and it appears that such definitions are the same in all the instructions and are only repeated after defining murder generally in connection with other matters upon which the jury are instructed in addition to the general definition of murder, such instructions of the court are not cumulative, and do not in themselves necessarily impress upon the minds of the jury the idea that in the opinion of the trial judge the defendant is guilty.

3. Where two instructions are given upon self-defense, and such instructions together state the law upon the subject of self-defense, this court will not reverse the case upon the assumed error that the court assumes and charges upon a theory not raised or indicated by the evidence, but will follow the rule announced by this court in the case of *State v. Wright,* 12 Ida. 212, 85 Pac. 493, wherein the court approved an instruction as follows: "An instruction that leaves the questions of fact to be found by the jury and only suggests the law applicable in case they find certain facts to exist, is not objectionable on the ground that it assumes that certain facts do exist."

4. Where instructions are requested by defendant at the conclusion of the trial, the trial judge is not justified in refusing the instructions on the ground that they were handed to him in bulk at or about the conclusion of the trial, but he should give such instructions if they state the law, or other instructions embracing the same principles of law, as the defendant is entitled to have the law given to the jury by the judge applicable to the facts as shown by the evidence introduced upon the trial.

5. It is not error of the trial court to refuse instructions tendered by defendant upon the trial of a criminal case, where the charge is murder, even though such instructions embrace the law applicable to the facts of the case, if the law so stated is covered by other instructions given by the court.

6. *Held,* in this case, that the evidence supports the verdict of the jury.

APPEAL from the District Court of the Fifth Judicial District for Bannock County. Hon. Alfred Budge, Judge.

A prosecution for the crime of murder. Judgment for the state finding the defendant guilty of murder in the second degree. *Affirmed.*

D. C. McDougall, for Appellant.

"The prevailing rule is that where evidence is erroneously admitted, or admitted on the promise to connect it with the other evidence, which promise is not fulfilled, the error may be cured by withdrawing it by an instruction which admonishes the jury in distinct terms not to regard it in considering their verdict." (Thompson on Trials, sec. 2354; *Davis v. Peveler,* 65 Mo. 189; *Zehner v. Kepler,* 16 Ind. 290; *Links v. State,* 13 Lea (Tenn.), 701.)

The charge of the court is cumulative, and repeats time and again in such manner as to impress upon the minds of the jurymen the idea that in the opinion of the trial judge the appellant was guilty. (*Powell v. Messer,* 18 Tex. 406; *Traylor v. Townsend,* 61 Tex. 147; *Irvine v. State,* 20 Tex. App. 12.)

"If the court assumes and charges on a theory not raised or indicated by the evidence, it is radical error, and fatal to the conviction." (*Thomas v. State,* 34 Tex. App. 482, 31 S. W. 170; *Ross v. State,* 10 Tex. App. 455, 38 Am. Rep. 643; *Hardin v. State,* 13 Tex. App. 193; *Lynch v. State,* 24 Tex. App. 362, 5 Am. St. 888, 6 S. W. 190.)

The court should have submitted appellant's offered instruction to the jury concerning the absence of malice shown. The record will show that the court in his charge to the jury defined malice four different times, thus making that question very prominent in said charge. (*State v. Hossack,* 116 Iowa, 194, 89 N. W. 1077; McClain, Crim. Law, sec. 419; *People v. Hyndman,* 99 Cal. 1, 33 Pac. 782; *Commonwealth v. Holmes,* 127 Mass. 424, 34 Am. Rep. 391.)

J. H. Peterson, Attorney General, J. J. Guheen and T. C. Coffin, Assistants, for Respondent.

A reading of the court's instructions so clearly shows the fairness of them that argument is unnecessary. (*State v. Marren,* 17 Ida. 766, 790, 107 Pac. 993.)

"An instruction that leaves the questions of fact to be found by the jury and only suggests the law applicable in case they find certain facts to exist is not objectionable upon the ground that it assumes that certain facts do exist." (*State v. Wright,* 12 Ida. 212, 85 Pac. 493.)

STEWART, J.—The appellant was tried upon an information against him by the prosecuting attorney of Bannock county, in which the appellant was charged with the crime of murder in the first degree in the killing of one Chauncey Sessions. The jury found the appellant guilty of murder in the second degree, and the trial court committed him to the state penitentiary for a term of from fifteen to thirty-five years. This appeal is from the judgment and also from the order denying a motion for a new trial.

It is admitted that the appellant killed Chauncey Sessions by cutting his throat with a knife. The facts are about as follows: The appellant and the deceased became acquainted about January 1, 1912. The killing occurred on September 2, 1912. The appellant and the deceased, after their acquaintance, became close friends and were often associated together. On the day of the killing the deceased came to Downey with a load of wheat, and after unloading the wheat at the elevator the deceased and the appellant met and they continued friendly thereafter up to the time of the killing. This meeting between the parties was in the morning on Labor Day. These parties associated with other parties and the entire crowd engaged in drinking intoxicating liquors more or less, and were under the influence of the liquor up to the time of the killing. The evidence shows very clearly that the appellant, the defendant, and the deceased, were on the best of terms with each other all the day. Just prior to the killing

Jack Russell and Nels C. Olsen were playing cards in the office of the elevator company. The table upon which they played was on the west side of the office and the entrance or door of the office was east of them, a distance of some six or eight feet. Others present at the time were the witnesses Norton, Robinson, Coffin, Cutright, deceased and appellant. The deceased was in the north part of the room, sitting or lying down on some grain sacks. Immediately preceding the difficulty the deceased and appellant were talking together in a friendly way. Appellant approached the table where Russell and Olsen were playing cards, when Russell asked him for a drink of whisky out of a bottle which appellant had, and appellant told Russell to go to hell, and further stated that if he (Russell) fooled with him that he would cut his damned head off and throw it at him, whereupon Russell said, "You would not cut anything." Appellant replied, "I'll show you," and proceeded to cut Russell's shirt on the left arm but did not touch Russell's flesh. Just after this occurred, and within a minute or two, Chauncey Sessions, the deceased, arose from the sacks where he had been sitting and lying and started toward the appellant and made the statement that the appellant had been trying to run over everybody all day, and that he was getting tired of it, and assaulted appellant from behind, grabbing him and striking him and trying to hit him with his fist, and there is evidence that the deceased struck appellant at least twice with his fist. The appellant about this time broke loose from the deceased and he stepped away from him and remarked: "Well, what do you know about that?" About this time they were passing words and striking at each other, and from their actions showed that they were all pretty thoroughly intoxicated and that they were acting under the influence of the liquor, and that none of the parties were prompted by any particular influence other than from the effects of the liquor. About this time the witness, Cutright, came to the door with a large knife in his hand, opened. And about this time the appellant struck Sessions, the deceased, and cut his throat, from the effect of which he died in about two hours afterward. There

Opinion of the Court—Stewart, J.

was only one stroke and one cut and one assault. The whole transaction did not take more than a few minutes.

The defendant, in relating what happened during the forenoon of the day of the killing, testifies that the appellant and the deceased and Russell, Olsen, Cutright, Toler, Norton and Robinson formed a party, and they were drinking, and they went on an auto ride down to Hot Springs, three or four miles from Downey, and then went back and got dinner and went to the elevator, and afterward joined together and were drinking again, and that the defendant had a knife which be bought about two months before that, which he used for sharpening pencils and marking in his business, as in concrete work on sidewalks, and that he kept the big blade sharp all the time for sharpening pencils, and that he and Sessions went over to Studebaker's place and all the way over he told Sessions that he had a sharp knife, and that he flourished the knife and handled it, and afterward, just before the trouble, that there was a wrestling contest between Sessions and Russell and they scuffled for some time, and Russell asked the appellant for a drink and the appellant refused to give him a drink and told him that he would not give him any. He says he was "kidding" with him. They were playing cards when he refused to give the drink. Russell said: "You would not cut anything." Appellant testifies: "I walked over beside his chair and was standing close to him and just cut his undershirt, just a little place, and walked a little farther and Olsen and Russell were playing cards. And all at once someone grabbed me and hit me; someone grabbed me and hit me and it kind of knocked me dizzy or blind, and next thing I knew I was standing somewhere in the building, I could not say where. There were several men around me,—four or five. Someone came rushing up and said 'Cut that out,' or something like that, and someone made a rush for me, and I cut at him with a knife. Someone grabbed me again and I cut at him. They got back then and I did not cut any more. Only two, I think. This transaction occurred about 5 or 6 o'clock in the evening. I was hit in the head. I could not see. I was dizzy and blind. I do not know who I struck. I

did not know it was Chauncey Sessions. The bunch got crowding around me and I thought they would be killing me. They grabbed me and I just cut out with the knife to make them get back.''

There is evidence on the part of the state that at the time of the cutting, and when the appellant came toward Sessions with his knife, the witness Coffin stepped between Sessions and the appellant and the appellant pulled the knife and reached over the shoulder of Coffin, who was between the two, and struck Sessions' neck and cut Sessions' throat, who was on the opposite side of Coffin from the appellant.

It is apparent that these parties were largely under the influence of liquor at the time the killing took place, and the details related above state the material and controlling facts that took place at that time.

The first error assigned is the giving of testimony by Olsen, a witness for the state, wherein the witness testified, over objections, that he saw and was with the appellant in the morning of the day of the killing and that the appellant gave the witness a bottle of whisky. The trial court permitted this answer by the witness, announcing at the time in ruling on the question of the admissibility that he would withdraw the same if its materiality was not shown, and appellant argues that the materiality of the testimony was not shown, and that it was error of the trial court in permitting the testimony to remain in the record, and that it was prejudicial to the rights of the defendant before the jury, in that it established a separate and independent crime, a violation of the local option law.

The trial court evidently overruled the objection upon the ground that if the evidence given by the witness became immaterial, the objection would be sustained, and the evidence given would be withdrawn. The record does not show that the question was acted upon by the trial court thereafter, and counsel for appellant in no way called the court's attention to this evidence or renewed the motion to strike out such evidence, or requested any instruction to the effect that the evidence was or was not material. The evidence, no doubt,

was introduced for the purpose of showing that the appellant in the morning of the day of the killing had in his possession a bottle of whisky, and that at the time of the killing the appellant and the others were drinking whisky and were drunk at the time, and in our judgment the evidence admitted and objected to would in no way prejudice the appellant, because it showed that he had in the morning a bottle of whisky. The fact that he had a bottle of whisky in the morning and was drunk later in the day could not prejudice the appellant or hurt him in any way, for he certainly had been drinking whisky and was drunk at the time he killed the deceased. The court does not feel justified in reversing the judgment upon an objection which could in no way prejudice the jury against the appellant.

The next error complained of is the admission of testimony given by the witness Merrill, wherein the witness testified that at his place of business, about 3 o'clock in the afternoon of the day of the killing, when Sessions and Willis were present, a conversation took place. Witness was asked the question whether Willis had anything in his hand while in the room, and the witness replied: "Yes, sir. Q. What? A. Knife. Q. What was he doing with the knife? A. Why, after he had been talking a few minutes he walked toward the front door just a few steps and he came back; he had a knife in his hand, and there was a little bit of a cut on his thumb, right thumb. He walked over and said, 'Which one of you wallopers cut me?' Someone said, 'Nobody,' and he says, 'I think I can stand my own. I have got the sharpest knife in Bannock county.' Q. In what way was he exhibiting that open knife upon that occasion? A. He seemed rather nervous. He kept turning it in this manner."

Counsel for appellant objected to the testimony and asked that it all be stricken out on the ground that it was irrelevant and immaterial as to what he may have said about his knife, and it was not directed toward the deceased and showed no trouble between the defendant and the deceased, and that this statement might have prejudiced the minds of the jury-

men. The court overruled the motion and no action was taken.

This incident related above occurred two or three hours before the killing of Sessions by Willis, at which time Willis, the appellant, took the life of Sessions by cutting his throat with a knife. The evidence shows that the appellant was seen with a knife in his hands, which he flourished in a threatening manner, and remarked: ''I think I can stand my own,'' and in two or three hours thereafter killed the deceased with a knife by cutting his throat. We think the incident related by the witness was a part of the *res gestae,* and was directly connected with the actual commission of the crime charged, and for this reason the court did not err in refusing to strike the evidence from the record. We think that the general rule governing the admission of declarations showing motive or intent is, to receive evidence of the declarations of parties accompanying their acts to show the motive or intent or state of mind with which such acts are performed. (Jones on Evidence (Ed. De Luxe), sec. 350.)

Assignments of error 4, 5, 6, and 7 relate to instructions given by the court, where it is claimed that the court gave prominence to the law of murder in the first and second degree and to malice, and to the length of time intervening between the intention to kill and the act of killing, and that a person acting in self-defense, when unlawfully assaulted, must not take the life of his assailant in a spirit of revenge or punishment. The chief argument against these instructions is that the court repeated the definition of murder and malice, and because of the repeated instructions the charge of the court was cumulative, and impressed upon the minds of the jurymen the idea that in the opinion of the trial judge the appellant was guilty. The foundation of this argument is, that the facts of this case show that the appellant was guilty of manslaughter, and not of murder of the first or second degree, and that the court prejudiced the jury by instructing them a number of times upon the question of murder in the first and second degree, to the exclusion of a like repetition as to the crime of manslaughter, thereby

prejudicing the jury against finding the appellant guilty of manslaughter. Of course the jury has the power and authority to determine the degree of the crime. Counsel for appellant directs the court's attention to a number of instructions wherein the court uses the word "murder," and defines murder of the first and second degree and malice. These instructions defining murder and murder in the first and second degree are in the words of the statute, secs. 6560, 6561 and 6562, and when these different instructions are examined, there was no particular repetition of "murder" in any sense which could prejudice the jury against the appellant. The court in the instructions defines malice in the language of the statute, sec. 6561, and the court also gave to the jury sec. 6568, which explains when homicide is excusable, and secs. 6569 and 6570, when homicide is justifiable. The repetitions referred to of murder in other instructions were in instructions dealing with the wilful, malicious, deliberate and premeditated acts of the person charged, and in no way modify or add any strength to the definition of murder as given by the trial court. We are of the opinion that there is no merit in assignments of error 4, 5, 6 and 7.

There is another reason why the jury was not prejudiced by these instructions. There can be no doubt of the defendant's guilt, and the jury could in no possible manner have been influenced to return a verdict of guilty by reason of the language objected to being repeated in the different instructions. There can be no doubt but that the defendant took the life of the deceased. The only question about which the jury could in any way have been in doubt was the degree of the crime, and the degree of the crime was an issue which the jury was called upon to fix, and the jury found the defendant guilty of murder in the second degree.

The next error assigned is that the trial court erred in giving certain instructions as follows: "You are further instructed, gentlemen of the jury, as a matter of law, that the term 'self-defense' implies, in this case, the defense of one's own person from a contemplated or attempted assault and this is generally the limit of the right; the rule cannot be

extended beyond the natural and inherent right that a person has to protect himself from harm or violence.''

This instruction is also argued further in the argument of the eleventh assignment of error. This assignment embraces a part of the instructions wherein the court instructed the jury: ''You are instructed, gentlemen of the jury, as a matter of law, that the term 'aggressor' in contemplation of law, is the one of two or more persons who begins an affray or combat. You are further instructed, as a matter of law, that the responsibility of being the aggressor in a combat may shift from one to the other of two combatants at different stages of the combat. In other words, one person may begin a combat and thereby become the aggressor; then if he in good faith withdraw from the combat, or if he should be placed in such a situation that the person originally assaulted, viewing the situation as a reasonable man, knew that all danger to him had passed, and then the said person originally assaulted should use further force, after all danger to him had passed as aforesaid, then in that instance he, the said person originally assaulted, would then become the aggressor, in the combat or affray, and if he should then kill the person who was the original aggressor, before he could successfully interpose a plea of self-defense, he would first have to show that he made an effort, in good faith, to withdraw from the combat.''

In this connection the appellant contends that the evidence in the case shows that the deceased withdrew from the combat, but does show that the deceased was the aggressor and had to be held to keep him off appellant. Neither was the deceased placed in such a situation that appellant knew that all danger to him had passed, and neither did appellant use further force, and the court in the instruction assumes that the deceased commenced the difficulty and that appellant resented the same with like force, which is not true, and that the appellant having used force after being attacked by the deceased, should have retreated in good faith before his right of self-defense would revive, and that the court's charge upon this point assumes the theory unsupported by the facts. While the ap-

pellants' contention might be true under certain facts, the
jury has found a different state of facts from that contended
for by appellant; consequently the appellant's contention
and theory are not applicable to the facts in this case.

Under this assignment of error the appellant cites a num-
ber of cases which lay down the rule that if the court assumes
and charges upon a theory not raised or indicated by the evi-
dence, it is radical error and fatal to the defense, citing:
*Thomas v. State,* 34 Tex. Cr. App. 481, 31 S. W. 170; *Ross v.
State,* 10 Tex. App. 455, 38 Am. Rep. 643; *Taylor v. State,*
13 Tex. App. 184; *Hardin v. State,* 13 Tex. App. 192; *Lynch
v. State,* 24 Tex. App. 350, 5 Am. St. 888, 6 S. W. 190.

In the case of *State v. Wright,* 12 Ida, 212, 85 Pac. 493, this
court considered a question assigned as error similar to the
contention urged in this case by appellant, and this court held:
"An instruction that leaves the questions of fact to be found
by the jury, and only suggests the law applicable in case
they find certain facts to exist, is not objectionable on the
ground that it assumes that certain facts do exist." This
case, in our judgment, states the rule applicable to the facts
in this case, and the facts were submitted to the jury who
have determined the question, and the facts of this case do
not fall within the rule announced in the cases cited by ap-
pellant.

Assignments 14, 19, 21 and 22 are errors assigned in the
refusal of the court to give instructions requested by the
appellant. The record shows this statement made by the trial
court: "These instructions were handed to me in bulk at or
about conclusion of the trial and were refused, except as
given as modified, for the reason of same being offered so
late in the trial, their length, etc." Instruction 14, which
was refused, deals with the reducing of homicide from the
grade of murder to that of manslaughter, upon the ground
of sudden quarrel or heated passion or provocation. The
court, however, instructed the jury fully as to what was
murder of the first degree, murder of the second degree and
manslaughter, and the jury were told that under the informa-
tion in this case the defendant may, if the evidence warrants

it, be convicted of murder in the first degree, murder in the second degree or manslaughter. The court also instructed the jury that manslaughter is an unlawful killing, without deliberation, premeditation or malice, and the court gave an instruction upon self-defense, as follows: "Self-defense, in proper cases, is the right of every person. It may be resorted to by anyone who is violently assaulted by another in such a manner as to cause the person so assaulted in good faith to believe that he is in immediate danger of either being killed or receiving great bodily harm from the assailant, and that the killing of the assailant appears to be the only means of escaping death or great bodily harm. In ordinary cases of one person killing another in self-defense, it must appear that the danger was so urgent and threatening that, in order to preserve his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary, or apparently necessary; and it must also appear that the person killed was the assailant, or that the slayer, if he were the assailant, in good faith endeavored to decline further combat before the mortal blow or injury was given. A bare fear of being killed or of receiving great bodily harm is not sufficient to justify a killing. It must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated, that the slayer was acting in good faith, viewing the situation and circumstances from his standpoint, and that the party killing really acted under the influence of such fear, and not in a spirit of revenge. The law of self-defense is a law of necessity, pure and simple. It is not an offensive law but a defensive law. Before the defendant would be justified in killing the deceased, he must be in danger, or apparently in danger, as viewed from his standpoint, of either losing his life or of receiving great bodily harm at the hands of the deceased at the place and at the instant when the fatal wound was inflicted which resulted in the death of the deceased."

It will be observed that the instructions given by the trial judge to the jury embraced the same rules of law applicable to the facts of the case as were contained in the instructions tendered by defendant and refused by the trial judge.

We do not agree, however, in the reason given by the trial court that the instructions were handed to the court in bulk at or about the conclusion of the trial and were refused. There is nothing in the record which shows that the court has such a rule or that such a rule had been announced in the present case, and the trial court should be cautious about refusing instructions at any time before the jury are instructed, where the instructions state the law applicable to the facts as they appear by the evidence. This rule should be strictly applied in a case where the crime charged is punishable by death.

The facts in the present case are almost identical with the case of *People v. Fitzgerald,* reported in 138 Cal. 39, 70 Pac. 1014, and the questions presented upon appeal in that case are practically the same questions that are presented in this case, and upon appeal the judgment in the California case was affirmed.

We have no doubt of the guilt of the defendant of murder in the second degree. Sec. 6560, Rev. Codes, defines: ''Murder is the unlawful killing of a human being, with malice aforethought.'' In the present case the defendant killed a human being, and his actions indicate malice aforethought. There was no considerable provocation shown, and the circumstances attending the killing show an abandoned and malignant heart. The rule is, malice is implied for any deliberate and cruel act against another, however sudden, which shows an abandoned and malignant heart, and the facts show there was malice in the acts of the defendant at the time of the killing.

The judgment is *affirmed.*

Ailshie, C. J., and Sullivan, J., concur.