506 P.2d 1340

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Bobby L. BEASON, Defendant-Appellant.**

No. 11061.

Supreme Court of Idaho.

March 1, 1973.

Howard D. Humphrey, Clemons, Cosho, Humphrey & Samuelson, Boise, for appellant.

W. Anthony Park, Atty. Gen., James G. Reid, Deputy Atty. Gen., Boise, for appellee.

McFADDEN, Justice.

Following a jury trial and verdict finding the defendant Bobby L. Beason guilty of murder in the second degree for the death of two year old Matthew Blair, the trial court entered judgment of conviction and sentenced him to a term not to exceed thirty years. This appeal is from the judgment and sentence.

The evidence in this case is basically circumstantial, and a review of the facts is essential to comprehend defendant's assignments of error. Until March of 1971 Matthew Blair lived alone with his mother Rebecca Blair. This ended shortly after Rebecca met the defendant sometime during the middle of March. Within a week Beason began living with Rebecca Blair in the home where Matthew lived. Beason intended to marry Rebecca and make Matthew his "own" son. Beason eventually married Rebecca Blair on June 8, 1971. (Hereinafter Rebecca will be referred to as Rebecca Beason.)

At the time of Matthew's death the defendant was eighteen years old. He worked as a manual laborer in a potato warehouse, had only completed the eleventh grade in school, and possessed no special skills. The pre-sentence psychological reports characterized Beason as having an intelligence level ranging from normal to low normal and "a poor impulse control, or acts out in an inept manner under minimal frustration." The reports also indicated that the defendant was not psychotic.

As a result of the relationship which developed while living with Rebecca Blair the defendant gradually assumed parental responsibilities over Matthew. During the second week of April, 1971, they moved from North Main Street in Blackfoot, Idaho, to North Schilling Street. After the move the defendant began disciplining Matthew and assisting Rebecca in his toilet training. Beason required that Matthew wash his "soiled" diapers in the toilet bowl as a "psychological" lesson. Prior to meeting the defendant Rebecca Beason had attempted to toilet train the child without success.

Although the mother usually changed Matthew's diapers, Beason occasionally performed this task. Rebecca Beason testified that the defendant often spanked Matthew for wetting his diapers. The frequency and severity of the discipline is a dominant issue in this appeal. For example, within a week after moving to Schilling Street Rebecca Beason complained to Beason about the severity of his corporal punishment of Matthew. Often, she interceded and told Beason "that's enough." Beason usually punished Matthew in the bathroom out of Rebecca's sight for wetting his diaper. Because her presence interfered with this discipline, Rebecca Beason absented herself from the bathroom. Rebecca explained that Matthew would attempt to go to her, if she were present, to seek love. From the record it is clear that Rebecca voluntarily consented to Beason disciplining Matthew within limits. Rebecca Beason stated that during the two weeks preceding his death Matthew occasionally exhibited fear of Beason.

Margo Westover, Rebecca Beason's cousin, described Beason's relationship with Matthew. On April 17, 1971, Beason, Matthew and Rebecca visited Margo Westover. Margo had tended Matthew ever since his birth. During this visit Beason told Margo that earlier in the morning Matthew soiled his diaper and that he spanked Matthew for it. In describing the spanking Beason exclaimed to Margo that he had really "showed him 'what for.'" She also stated:

"A. Matt was crying and trying to get down so he could go to his mother, and Bobby [Beason] wouldn't let him down for a minute. And finally he set him down on the floor, and, as Matt started

walking towards his mother, Bobby grabbed ahold of his shirt and pulled him down. And Matt got up and he—Bobby grabbed ahold of his shirt and pulled him down again, and Matt got up and—and the same thing happened again, but this time, when he got up, he quit, and Matt got to go to Rebecca."

Margo testified that Matthew's eyes looked "watery" and that Matthew sat listlessly on the couch during this visit. When Beason picked Matthew up once, Margo saw a big red bruise on Matthew's back above his waist. Margo identified this bruise in a photograph exhibit during the trial. On April 16, a day earlier, Margo noticed two scratches on Matthew's forehead and cheek. Prior to these occasions Margo never saw any bruises or other injuries on Matthew. A photograph taken by Margo on April 2, 1971, showed Matthew as a normal, healthy child without any visible injuries; this photograph sharply contrasts with the state's post mortem photographic exhibits showing multiple bruises on Matthew's body and head. As a result of Matthew's poor physical appearance and Beason's handling of the child, on April 18, 1971, Margo called an employee of the Idaho State Department of Public Assistance to report a possible case of child abuse.

A number of witnesses, all the defendant's relatives, described numerous mishaps and accidents which befell Matthew during the two weeks preceding his death. All of these accidents allegedly produced various bruises and injuries on Matthew. Although this testimony is unrefuted, none of the accounts accurately describe the extent and nature of the injuries. For example, Rebecca Beason could not remember exactly when Matthew was injured on two occasions; she offered no description of the resulting injuries. During the first two weeks of April Matthew purportedly had five distinctly different accidents: two falls off porches, a fall from a swing, a fall from a tricycle, and a fall on a disassembled automobile engine. The latter accident apparently was the most serious. On April 15, 1971, Beason and Matthew visited Chester Lewis, Beason's uncle. Matthew was playing near a disassembled automobile engine. Mrs. Norma Robinson, Beason's aunt, described the mishap at trial as follows:

"A. Well, he was playing near a corner in the garage, and there was a motor there; and the motor had the head parts off, and there were head bolts and some little things like fingers sticking up through the motor; it wasn't covered; and he fell into this motor, and one of them kind of went inside of his mouth, and I saw some blood running and I screamed, and Lucinda picked the baby up and went into the house; and it had hit its stomach kinda across the motor as it fell into these things.

Q. Could you describe the fall with respect to its—the degree of force that might be involved?

A. Well he—when he went into it, he kind of flipped; he fell on his stomach; and it—I think it must have been a larger car; it wasn't one of those six cylinders like I've seen; it had the four on one side and four things on the other side of it; and he flipped right over into it; he made almost a somersault."

It is diffficult to correlate the bruises on Matthew's body visible in the photographic exhibits with the testimony concerning his accidents. Furthermore, none of the witnesses testified about a large bruise appearing above the pubic area which the pathologist deemed related to a blow or force which caused Matthew's fatal injuries.

The only sources of information concerning the events surrounding Matthew's death are the testimony of Rebecca and the defendant and testimony and photographs of the condition of the child's body. Apparently, most of the events focus around the activity in the bathroom when the defendant disciplined Matthew and changed his diapers. The major inconsistency between Beason's and Rebecca's versions appears in the timing of certain events. Initially, Rebecca testified that dinner was at 6:00 p. m. and Matthew's bedtime was 6:30.

Under cross-examination by the defense attorney she retreated from her earlier time estimates and placed each event an hour to an hour and a half later in the evening. This testimony coincided with the defendant's version.

Because her narrative is restrained and cautious, Rebecca Beason's testimony is not informative in deciphering the sketchy events which occurred that evening. After Matthew went to bed, Rebecca Beason never saw him alive again. Between 6:30 p. m. (or 8:00 p. m.) and 10:30 p. m. Rebecca was either watching television or lying on her bed alone. She never accompanied Beason and Matthew into the bathroom. Consequently, her testimony stems basically from what she heard. First, Rebecca stated she heard some "banging sounds" come from the bathroom. Secondly, she stated she heard Matthew squeal or holler. In her testimony Rebecca, aided by an earlier statement made to the police, recounted what she overheard that evening:

"Q. And that later on in that same statement—As a matter of fact, one of the last things you told Mr. Taylor and Mr. Summers before you went in and wrote your statement, do you remember saying something to this effect: 'That Bobby raised his voice real loud'—Now talking about Sunday night, O.K.?—

A. Uh-huh.

Q. —'That Bobby raised his voice real loud with Matt when they were in the bathroom the first time, had said something to the effect as "why did you do that?"'

A. Yes, I can remember saying that.

Q. O.K. Do you know what the banging on the tub was?

A. I couldn't say for sure.

Q. Do you know how many times you'd heard it before?

A. Many times.

Q. That same night you heard spanking in the bathroom, too, didn't you?

A. I cannot remember."

\* \* \* \* \* \*

Q. And also you heard Matt scream at least twice, didn't you?

A. I wouldn't say it was a scream.

Q. But it stopped suddenly?

A. I don't know—I don't know what you mean.

Q. Well, it stopped suddenly, the screaming?

A. Not really.

\* \* \* \* \* \*

Q. Or at least the noise he was making, it was quite loud, whatever it was, wasn't it?

A. It was loud.

Q. And, as a matter of fact, there had been times before in which you had seen Bobby put his hand over Matt's mouth to stop him from screaming, hadn't there?

A. No.

Q. You had never heard that?

A. No.

Q. And back to the time that you were talking to Mr. Taylor and Mr. Summers —the first time, just before you wrote your statement, on the 19th day of April, at or about 8:55 in the morning—do you remember which time?

A. I remember being there.

Q. O.K. Do you remember telling them at that time something to the effect that, 'Matt wet his pants and Bobby took him to the bathroom'—do you remember that? 'and made Matt wash out his diaper?'

A. Yes."

Beason's narration of the evening centers around four trips to the bathroom. On each occasion he took Matthew with him. Twice Matthew went to the bathroom for wetting his diapers and Beason spanked him. The third and fourth trips to the bathroom involve Beason's efforts to free vomitus from Matthew's mouth. Beason's testimony is summarized as follows. After putting Matthew to bed around 8:00 p. m., Beason returned to the living room to watch television with Re-

becca. After an undetermined length of time, Beason heard Matthew, went to his bedroom, and then took him to the bathroom for a diaper change. During the first visit to the bathroom he bathed Matthew and changed his clothes. Immediately upon returning him to his bed Beason stated he took Matthew to the bathroom for a second time. This time he told Matthew to wash his diaper. The child refused, and Beason "swatted" him two or three times on the buttocks. He admitted the force of the "swats" may have pushed Mathew's stomach against the toilet bowl. He then wiped Matthew with the soiled diaper which had been rinsed in the toilet. Matthew squealed for a moment and then calmed down. Returning to Matthew's bedroom, Beason laid him on the bed. At this point Matthew became ill and regurgitated. Beason rushed Matthew to the bathroom and inverted him over the toilet. According to Beason Matthew gulped for air "between convulsions of throwing up."

"He'd threw up a couple times, and then seemed to be O.K.

Q. All right. Fine. Go right ahead.
A. He seemed to be running a real fever; he looked a little bit pale; he looked red, and the redness—and when he stopped vomiting, he started to get pale, he started to look, you know, better.

And it never occurred to me at the time how most people gasp for air after something—for being excited; he didn't do it like he usually did. And I don't know how hard I squeezed him or where. I know it just was all so confusing and—
Q. Were you trying to expel anything from him?
A. Yes, trying to help him. And then he seemed to be running a fever; he got real hot.

There's two bottles in the medicine cabinet; one of them was Vicks and I thought I grabbed the Vicks; and I rubbed him down, I laid him on the rug in front of the sink and rubbed him down; and I picked him up and I took him into our bedroom."

Believing Matthew recovered, Beason took him to Rebecca in the other bedroom. Although Beason and Matthew laid down beside her, Rebecca faced the opposite direction, and ignored them. Rebecca explained her action resulted from being excluded from Matthew's preparation for bed. Apparently, Rebecca was unhappy or angry. Consequently, Rebecca never knew whether Matthew was alive at this moment. While he was on the bed with Rebecca, according to Beason, Matthew vomited again. Beason rushed him to the bathroom where he frantially tried to expel the vomitus from Matthew's mouth. Because Matthew's jaws locked, Beason pried them open with a fingernail clipper to restore his breathing:

"There was a fingernail clippers on the sink; and I grabbed them and put the flat part in his mouth and turned it, and his mouth was just like a spring on a car; it just shot open, and, with the opening of his mouth, he expelled, and it was all—O.K."

Since Matthew was breathing, although in an extremely labored manner, Beason took him to the livingroom and prepared a bed on a couch. Matthew's condition appeared to deteriorate at this point. Worried, Beason asked Rebecca to assist him; until this moment Rebecca apparently had been oblivious to all the activity. Both of them looked at Matthew; he appeared pale. Beason testified that Matthew's fever dropped and he was "chilling." Fearing that Matthew had stopped breathing, Beason told Rebecca to call for an ambulance at 10:30 p. m. Then, Beason attempted to apply artificial respiration to Matthew, but he failed.

The ambulance arrived between 10:35 and 10:45 p. m. The driver examined Matthew for signs of life but found none. Although the house was warm, the ambulance driver testified that there was no heat in the child's body and that the child's color

appeared unusually pale as if he had been already embalmed. Around 11:00 p. m., the driver notified Mr. Staley, the coroner, of the child's death. The coroner examined the body and found it "quite cool." The ambulance driver delivered Matthew's body to the Sandberg-Hill Funeral Home between 11:30 p. m. and 12:00 p. m.

After the body was delivered to the mortuary, the coroner called the police. Detective Noble Taylor of the Blackfoot Police Department came and took photographs of Matthew's body. Some of these pictures were admitted in evidence at trial proving the body's physical condition. Matthew's body was embalmed around 12:15 a. m. on April 19, 1971. From the testimony of the mortician and the pathologist the embalming had no appreciable effect on the coloration of the bruises.

On April 19, 1971, Dr. Edward E. Fisher, a pathologist, performed an autopsy on Matthew Blair's body. Dr. Fisher described his findings from the autopsy as follows: the lining in the back of the abdomen, the retroperitoneum, was torn 15 cm extending from the urinary bladder to the right kidney. Matthew's lung tissue showed slight bleeding. Also, the urinary bladder and the right kidney were lacerated. The autopsy revealed no intracranial injuries which were connected with the cause of death. The pathologist specifically narrowed the cause of death to the ruptured inferior mesenteric artery. The inferior mesenteric artery, a major branch of the aorta, supplies blood to portions of the large intestine, rectum, and pelvic area in the body. About 400 cc's of blood were found in the body cavity. The pathologist identified a large, red bruise appearing above the pubic area. In the opinion of the pathologist the bruise was consistent with a blow which produced the cause of death. Such a blow or force, in the pathologist's opinion, would have to have been directed at the front of the child to rupture the artery. The pathologist stated that a hemorrhaging causes gasping and labored breathing and could produce convulsions.

Depending upon the amount of pressure on Matthew's stomach, the pathologist stated death could occur from within ten minutes to an hour. Finally, there was no vomitus in the larynx or throat.

The defendant, Beason, was charged with the murder of Matthew Blair in the second degree and arrested and apprised of his constitutional rights on April 19, 1971. In the morning of April 19, police officers of the City of Blackfoot questioned the defendant and Rebecca. Although Beason's statements were recorded on tape, that tape was not offered by either party for admission in evidence. On the same day bail for Beason was set at $10,000, and an attorney was appointed by the magistrate's court. After the bond was reduced to $5,000 Beason was released under bail on May 22, 1971. After a preliminary hearing, the magistrate's court entered an order on July 2, 1971, binding the defendant over for trial in the district court. At arraignment on July 26, 1971, on the information for second degree murder the defendant pleaded not guilty. The sureties released themselves from bond and he was incarcerated on October 26, 1971. Pursuant to an order of the district court on November 2, 1971, the State Hospital South conducted a complete psychological examination of the defendant. After trial, a jury, on December 2, 1971, found Beason guilty of second degree murder, and the district court sentenced him to serve a term in the Idaho State Penitentiary not to exceed thirty years. A motion for a new trial on grounds similar to the assignments of error presented in this appeal was denied by the district court on December 14, 1971, and this appeal followed. This Court granted the defendant's motion to augment the record upon appeal on July 10, 1972. After the case was argued before this Court, Beason submitted a handwritten post-argument brief on October 11, 1972.

By his first assignment of error, the defendant contends that prejudicial pre-trial publicity denied him the right to an impartial jury trial. Three newspaper articles

appearing in newspapers published in Pocatello and Idaho Falls, Idaho, and Ogden, Utah, form the basis of this assignment of error. By order of this Court the record was allowed to be augmented to bring this material before the Court for consideration.

All three of the articles were published on April 20, 1971, two days after the child's death. Two of the articles stated that the child died of a "beating" on April 18, 1971, and that the defendant had been charged with second degree murder. Each of the articles quoted the Bingham County coroner, Mr. Staley, as saying the child had been beaten. One of the articles stated the coroner explicitly attributed the "beating" to a "hand or feet."

In support of his position the defendant relies heavily on Irvin v. Dowd, 366 U.S. 717, 81 S.Ct 1639, 6 L.Ed.2d 751 (1961), and United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir. 1963), cert. den. 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143. See, State v. Thomas, 94 Idaho 430, 489 P.2d 1310 (1971); State v. Bitz, 93 Idaho 239, 460 P.2d 374 (1969); State v. Cypher, 92 Idaho 159, 438 P.2d 904 (1968).

This record reflects no pervasive pretrial publicity as discussed in Irvin v. Dowd and United States ex rel. Bloeth v. Denno, supra. In those cases the extent of the publicity was held to create a presumption of prejudice. The record here does not reflect that any juror expressed the view of defendant's guilt; nor does the record here disclose any extensive publicity of other crimes attributable to the defendant, as was true in United States ex rel. Bloeth v. Denno, supra. This case falls short of the circus atmosphere during the trial in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct 1507, 16 L.Ed.2d 600 (1966), and the problem of public prejudgment of guilt based on an erroneous account of a confession coupled with intense racial bias in Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951).

Defendant, nonetheless, argues that evidence of pretrial prejudice can be found in the voir dire examination of six veniremen.

Four of these, who later sat as trial jurors, admitted that the death of a two year old child raised prejudicial emotions against the defendant. Upon voir dire examination by defendant's counsel, each of these jurors stated that such emotion and prejudice could be set aside and that the facts of the case would be objectively weighed. The other two veniremen stated on voir dire examination that personal or religious convictions raised emotional feelings against the defendant. The state peremptorily challenged each of these prospective jurors, and they did not sit as jurors on the case.

■ The Sixth Amendment of the Constitution of the United States' requirement for a trial by "an impartial jury" is made applicable to the individual states through the Fourteenth Amendment. Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). In Irvin v. Dowd, supra, the Supreme Court stated:

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." 366 U.S. at 722, 81 S.Ct. at 1642, 6 L.Ed 2d at 755.

In that case that Court also stated:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [Citations omitted.]" 366 U.S.

at 722, 723, 81 S.Ct. at 1642–1643, 6 L.Ed. 2d at 756.

■ Applying the standards of Irvin v. Dowd, supra, to the facts presented here, it is our conclusion that there was no showing of prejudice or bias of the jurors to require a new trial. The newspaper articles themselves reveal no evidence of highly inflammatory nature, and there is no evidence in the record of the voir dire examination of the jurors connecting these statements in the newspaper articles with the jurors' preconceptions or notions of guilt. The voir dire examination reflects that the questions in the minds of the jurors as to their own individual bias or prejudice stemmed solely from their personal abhorrence of the circumstances of the death of a two year old child. The voir dire examination also discloses that the empaneled jurors advised that they would be able to lay aside any of their own preconceived ideas and would be able to render a verdict based only on the facts developed on trial.

We find no merit to defendant's first assignment of error.

■ Defendant by his second assignment of error contends that the trial court erred in misdirecting the jury in two respects. The first issue presented by this assignment is that the trial court erred in not giving defendant's requested instruction III which reads:

"You are instructed that mere opportunity for the commission of an offense, such as is charged in this case, is not sufficient corroboration to justify or warrant a verdict of guilty. In other words mere opportunity can never justify the conviction of a criminal offense."

In support of his contention, defendant cites State v. Short, 39 Idaho 446, 228 P. 274 (1924); State v. Bowker, 40 Idaho 74, 231 P. 706 (1924); State v. Mason, 41 Idaho 506, 239 P. 733 (1925); State v. Jones, 62 Idaho 552, 113 P.2d 1106 (1941); and State v. Elsen, 68 Idaho 50, 187 P.2d 976 (1947). All of these cases involved the issue of whether there was sufficient evidence to corroborate the statements of the complaining witness who had been the victim of a rape. No issue is presented in this case of corroborating a victim's testimony. The instruction as requested was inapplicable to this type of case, and there was no error committed by the trial court in refusing to give this requested instruction.

■ The last half of defendant's second assignment of error is that the trial court erred in not giving an instruction to the jury concerning voluntary manslaughter. Although the defendant never requested such an instruction, the defendant contends that it was the duty of the trial court to instruct the jury not only on the law concerning the crime with which the defendant was charged, i. e., murder in the second degree, but also on the lessor degrees of homicide, including voluntary manslaughter. The instructions given by the court included instructions covering the law on involuntary manslaughter.

I.C. § 19–2132 provides in part:

"In charging the jury, the court must state to them all matters of law necessary for their information. * * *"

This provision requires that the trial court give, on its own motion, pertinent instructions by which the jury may be correctly informed with respect to the nature and elements of the crime charged and to the essential legal principles *applicable to* the evidence that has been admitted. State v. Patterson, 60 Idaho 67, 88 P.2d 493 (1939); State v. Freeman, 85 Idaho 339, 379 P.2d 632 (1963). However, if the accused desires additional instructions on a particular point, he must submit a request encompassing a correct statement of the law on the point he desires covered. Otherwise, error cannot be assigned on that point. State v. Harness, 10 Idaho 18, 76 P. 788 (1904); State v. Patterson, supra.

■ One other statute which merits consideration in this context is I.C. §. 19–2312:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that

with which he is charged in the indictment, or of an attempt to commit the offense."

This statute pertains to the responsibility of the trial court in instructing the jury. Providing there is evidence, it requires the trial court to instruct on "any offense, the commission of which is necessarily included in that with which [the accused] is charged." The court should instruct the jury upon every material question upon which there is evidence deserving consideration. See, People v. Jeter, 60 Cal.2d 671, 36 Cal.Rptr. 323, 388 P.2d 355 (1964); People v. Morse, 70 Cal.2d 711, 76 Cal. Rptr. 391, 452 P.2d 607 (1969).

Voluntary manslaughter is defined by I. C. § 18–4006:

"Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary * * *."

In this case there is nothing in the evidence before the court which would in any way indicate that the accused acted upon a "sudden quarrel or heat of passion." Under these circumstances we find no error in the trial court not giving an instruction on voluntary manslaughter.

■ The third assignment of error attacks the district court's jury instruction No. 7 on implied malice. The jury instruction states:

"Murder is the unlawful killing of a human being with malice aforethought.

Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow human being. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

The defendant argues that from this instruction the jury could have implied the necessary malice for second degree murder in the absence of any showing of provocation. Thus, in a trial for infanticide the defendant claims the jury could have found him guilty if he simply intended to spank the child and the child accidentally died. The defendant concedes that usually the use of legislative terms in I.C. § 18–4002 for jury instructions is not error. See, State v. Anstine, 91 Idaho 169, 418 P.2d 210 (1966). The defendant further concedes that the jury instruction accurately reflects I.C. § 18–4002 which defines express or implied malice.

■ Under I.C. § 18–4003, the different degrees of murder are specifically designated. No error is assigned alleging that an instruction concerning second degree murder was improper. The only question is whether the instruction defining the elements from which the jury could imply malice was error. This case does not disclose any facts showing express malice on the part of the appellant. Therefore, it is necessary to weigh all the facts to imply malice. The absence or presence of provocation is a pertinent fact which must be considered with all the other circumstantial evidence relevant to the appellant's actions.

" 'The rule is malice is implied for any deliberate and cruel act against another, however sudden, which shows an abandoned and malignant heart, and the facts show there was malice in the acts of the defendant at the time of the killing.' " State v. Snowden, 79 Idaho 266, 272, 313 P.2d 706, 709 (1957), quoting from State v. Willis, 24 Idaho 252, 132 P. 962, 967 (1913).

In this case there is direct evidence that a two year old child died as a result of internal hemorrhaging. The cause of the child's fatal and severe injuries, in the opinion of a qualified pathologist, was a blow or substantial force delivered to the abdominal area. The defendant was the only person present when such a blow could have been dealt to the child. In this case, there is no evidence of provocation. Consequently, it would be proper to consider whether the defendant maliciously or negligently killed the child. Although the defendant argues that the provocation issue

misled the jury and overshadowed the issue of accidental death, the district court, however, instructed the jury on involuntary manslaughter which apprised the jury of accidental death or negligence causing death. We conclude that defendant's assignment of error is without merit. See, State v. Fleming, 17 Idaho 471, 493, 106 P. 305 (1910).

Defendant's fourth assignment of error is directed to the admission in evidence of four color photographs of the body of the deceased child. State's exhibits G and H were taken of the body before an autopsy was performed. Exhibits I and J were color photographs of the head of the deceased child and were taken while the autopsy was being performed portraying the head after the scalp had been peeled back.

■ Exhibit G is a photograph of the body laying on its stomach showing the back and right side from the head to the middle of the thigh. Exhibit H is a photograph of the body laying on its back displaying the child's midsection from upper thigh to the chest. This exhibit illustrated the injuries appearing on the child's abdomen including a large bruise in the pubic area. At the time these two exhibits were offered in evidence there had already been offered and admitted in evidence. without objection six other color photographs taken prior to the time the body was embalmed and prior to the time the autopsy was performed.

The defendant objected to the admission in evidence of exhibits G and H on the grounds that they were repetitious, that they showed substantially the same as previous exhibits, and that they thus became inflammatory and prejudicial.

In State v. Martinez, 92 Idaho 183, 188, 439 P.2d 691, 696 (1968), this Court stated:

"The general rule is that photographs of the victim in a prosecution for homicide duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, proof of the *corpus delicti*, extent of injury, condition and identification of the body, or for their bearing on the question of the degree or atrociousness of the crime, even though such photographs may have the additional effect of tending to excite the emotions of the jury."

It is not questioned that the exhibits faithfully represented the condition, nature and extent of the bruises on the body. It is recognized that there may have been some degree of repetition with some of the other photographs, but these two exhibits, G and H, gave somewhat different views of the injuries. Their inflammatory effect would be minor when considered with the other photographs of the body. We find no error concerning the admission of exhibits G and H.

The admission of exhibits I and J present a somewhat different problem. These two pictures were taken while the autopsy on the child's body was being performed. They portray the child's head, after the scalp had been peeled back, and show the underside of the scalp itself with considerable discoloration and the skull which also shows discoloration. When these exhibits were offered in evidence the defendant examined the pathologist on voir dire in aid of an objection. During this examination Dr. Fisher stated he found no intracranial hemorrhage or subdural hemorrhage. He also stated the discolorations in the photograph were "immediately below the skin that forms the scalp." The doctor described them as though one were looking at the underside of a bruise. Dr. Fisher emphasized that these injuries were not sufficient to have produced the death of the child.

Following this examination, the defendant objected to their admission on the ground that there had been no *corpus delicti* shown in the case; that what the exhibits purported to show was not related to any act or conduct on the part of the defendant; and that they were not competent, material, or relevant to any issue in the case. The trial court overruled this ob-

jection and ordered the exhibits to be admitted.

◼ As previously pointed out (pertaining to the issue presented by the admissibility of exhibits G and H), the admissibility of photographs of a homicide victim is generally a question for the trial court. In the exercise of its discretion, the trial court must first determine the relevancy of the offered exhibit.[1] After an affirmative determination of the issue of relevancy has been made, then the trial court has to make the determination whether the probative value of the offered evidence is outweighed by the inflammatory effect of the pictures. In State v. Martinez, supra, this Court quoted from Napier v. Commonwealth of Kentucky, 426 S.W.2d 121 (Ky.Ct.App. 1968), wherein that court discussed the susceptibility of modern jurors to be unduly affected by photographs of a gruesome nature. The Kentucky court stated:

"But we need not depend on that principle [the trial court weighing relevancy as opposed to inflammatory nature of the evidence] as a basis for holding this particular photograph admissible. That fact is that it was not so gruesome as to be likely to prejudice or inflame the men and women, inured as they are to the horrors of both war and television, who sit on a modern jury. The time has come when it should be presumed that a person capable of serving as a juror in a murder case can, without losing his head, bear the sight of a photograph showing the body of the decedent in the condition or place in which found." 426 S.W.2d at 122, 123.

◼ Thus, in resolving the issue presented by defendant's assignment of error, this court must first determine whether exhibits I and J were relevant. It is our conclusion that under the facts of this case they did tend to prove factual issues then before the court for resolution by the jury. During presentation of the state's case certain witnesses testified that the deceased child at varying times—from a few days to a number of days prior to his death—had fallen while at play and in varying manners had been injured about his head and body. Dr. Fisher testified that the head injuries were examined during the autopsy and were not the cause of the child's death. Exhibits I and J were explanatory of Dr. Fisher's testimony. His testimony established that the bruises around the head, which were also disclosed in other exhibits, had nothing to do with the ultimate cause of death. These exhibits substantiated the state's theory of the case in portraying in detail injuries the child had suffered and tended to disprove any suggestion that death came as a result of any head injury which he had suffered in falls in the days preceding his death.

---

1. Bell, Handbook of Evidence (2d Ed. 1972) Ch. 6, p. 106–107, states: "The pleadings and the substantive law delineate the issues of the case. If a fact is not in issue, any evidence to prove that fact is irrelevant. A second type of irrelevancy is the failure of a proffered item of evidence to be probative of an issue in the case. It is this second type of irrelevancy that is involved in this chapter. Relevancy in this second sense of the term is a relationship between offered evidence and an issue in the case. In determining whether the evidence is relevant, the courts must resort to logic, scientific knowledge, and common experience. Any legal evidence which logically tends to prove or to disprove a fact in issue is relevant and therefore admissible, provided it is not too remote or speculative or otherwise of such slight probative value as to justify the court in excluding it on the ground of immateriality. State v. Farris, 48 Idaho 439, 282 P. 489 (1929).

\* \* \* \*

"Confusion of the jury, limitations of time for trials, and undue prejudice to the opposing party are all factors which must be balanced against the value of the particular item of circumstantial evidence as proof in the case. Trial courts and appellate courts may differ on these policy considerations and the logical tendency of evidence to establish a fact in issue. While there is no finality to the determination by the trial court, an appellate court should hesitate to superimpose its judgment to the contrary as to the probative value of the evidence. State v. Alvord, 47 Idaho 162, 272 P. 1010 (1928)."

The trial court was in a far better position to determine whether the probative value was sufficient to overcome any possible inflammatory effect on the jury. It is our conclusion that the trial court did not err in admitting these exhibits in evidence. State v. Martinez, 92 Idaho 183, 439 P.2d 691 (1968). See, State v. Solomon, 222 La. 269, 62 So.2d 481 (1952); State v. Bucanis, 26 N.J. 45, 138 A.2d 739 (1957); State v. Johnson, 57 N.M. 716, 263 P.2d 282 (1953). Contra, see, People v. Redston, 139 Cal.App.2d 485, 293 P.2d 880 (1956); State v. Poe, 21 Utah 2d 113, 441 P.2d 512 (1968); Archina v. People, 135 Colo. 8, 307 P.2d 1083 (1957). See generally, Annot: 73 A.L.R.2d 769 (1960).

█ The defendant by his fifth assignment of error contends that certain remarks in the prosecutor's summation to the jury rendered the trial unfair. The defendant contends the remarks imply that the defendant had stomped or kicked the decedent. In the prosecutor's closing argument the record discloses:

"Now I want to make this suggestion. I think everything that Mr. Beason told us that happened that Sunday from the time that he went into the bathroom with that child to change that diaper the second time—everything he said was substantially the truth, except for three things: One, the three swats on the hind end; the other one is, all these bruises and injuries on these lips; and the third one, the time element. Because the doctor told us—and you remember that the convulsions came after the hitting. Now that's where it's not in harmony with what the doctor told us and showed us here. But the convulsions afterwards, the throwing up, the gasping of air, the air hunger, these are all synonymous with a great deal of force having been applied. You just take that and exchange it with the three little swats. You put a big stomp or a kick—

MR. ANDERSON: Your Honor, we object to that argument. There is no evidence in this case of stomping or kicking. It's highly prejudicial.

THE COURT: Mr. Anderson, the jury has heard all of the evidence in this case, and the matters of the evidence they heard and the matters of inferences to be drawn therefrom are in the province of the jury. And with that understanding, and under those instructions, I think it is solely a matter for the jury to determine. And what counsel says is not evidence. They have been so instructed."

There was no evidence in the record that defendant ever stomped or kicked the decedent. However, the State argues that such a statement is permissible as an inference to be drawn from the evidence presented at the trial. It is the conclusion of this Court that the remarks made by the prosecutor were not improper; the prosecutor presented to the jury an argument based on facts established at trial and in effect argued that from the known facts a further inference could be made. We find no error in this regard.

█ By his sixth assignment of error the defendant contends there was no evidence disclosing that he intentionally beat and wounded the child, or that the beating and wounding was accomplished with malice aforethought. We cannot agree with this contention. The uncontroverted evidence established that the child died as a result of hemorrhage from the severed mesenteric artery. In the pathologist's opinion severing of this artery could only be accomplished by the application of "considerable force." The evidence also disclosed that defendant was the only person caring for the child during the critical hours. Both the ambulance driver and the coroner testified that when they examined the child's body shortly after they arrived it was pale and cold. This indicates that the child had not just then expired. It is our conclusion that from the record as a whole, and particularly, the magnitude of the internal injuries inflicted there is sufficient evidence from which the jury could have inferred the malice essential to support the conviction of second degree murder. Cf. State

**280**

v. Sanchez, 94 Idaho 125, 483 P.2d 173 (1971).

The next assignment of error is that the sentence imposed was unwarranted and an abuse of discretion in light of the nature of the crime and the age and background of the defendant. With this contention we do not agree. I.C. § 18–4004 provides that the punishment for second-degree murder may extend to life. See, King v. State, 91 Idaho 97, 416 P.2d 44 (1966); State v. Butler, 93 Idaho 492, 464 P.2d 931 (1970). The sentence imposed here, not to exceed thirty years, is within the permissible limits of the statute.

Defendant's final assignment of error is that the totality of errors require granting of a new trial. This Court has considered all errors assigned, and from a review of the record as a whole we find no error.

The judgment of conviction is affirmed.

DONALDSON, C. J., and SHEPARD, McQUADE and BAKES, JJ., concur.